**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA,**
**EASTERN (OPELIKA) DIVISION**

| | |
|---|---|
| Donte **TONEY** | ) |
| | ) Case No.: **3:07-cv-73-MEF-WC** |
| Plaintiff | ) |
| | ) Chief District Judge Mark E. Fuller |
| **v.** | ) Magistrate Judge Wallace Capel, Jr. |
| | ) |
| **DAIMLERCHRYSLER CORP.** | ) |
| **CHIP ELLIS CARS AMERICA, INC.** | ) |
| **CHIP ELLIS, INC.** | ) ***Oral Argument Not Requested*** |
| | ) |
| Defendants | ) |

**PLAINTIFF'S BRIEF IN SUPPORT**
**OF HIS MOTION TO REMAND**

Comes now the Plaintiff, Donte Toney, who offers this brief in support of his motion to remand this Alabama state law personal injury automotive products liability action back to the Circuit Court of Macon County, Alabama [CV-06-244] ("State Court").

**Statement of Case / Summary of Argument**

On or about July 31, 2006, Plaintiff was driving a 2000 Chrysler Cirrus vehicle, VIN 1C3EJ56HXYN103944 ("Subject Vehicle"), northbound on Alabama Highway 199 in Macon County, Alabama. As the Subject Vehicle rounded a curve, the Plaintiff lost directional stability, and it rolled-over and landed on its roof. Because the roof was not designed properly, it collapsed, and caused Plaintiff's spinal injury and quadriplegia. (Doc.1,Ex.A, ¶¶6,10)

On December 11, 2006, Plaintiff filed the instant case in State Court against three Defendants: (1) the DaimlerChrysler Corporation ("DCC"); (2) Chip Ellis Cars America, Inc.; and (3) Chip Ellis, Inc. (the latter two collectively referred hereinafter as the "Chip Ellis Defendants"). The complaint states the following personal injury product liability claims against all three Defendants: (1) the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"); (2) common

1

law negligence principles; (3) common law wantonness principles; and (4) the implied warranty of merchantability (Ala. Code § 7-2-314). Each of these four claims asserts three theories of liability: (1) that the steering system of the Subject Vehicle was defectively designed, which resulted in the loss of directional stability; (2) that the roof structure for the Subject Vehicle was defectively designed, which caused it to collapse during the roll-over accident; and (3) that the Subject Vehicle was not accompanied by warnings on the above dangers. (Doc.1,Ex.A)

On January 25, 2006, DCC removed this case to this Court on grounds of alleged "federal officer" removal jurisdiction pursuant to 28 U.S.C. § 1442(a)(1) and alleged diversity jurisdiction pursuant to 28 U.S.C. § 1441(a) and § 1332(a)(1). Thereafter, the Plaintiff filed the subject motion to remand. This case should be remanded because this Court does not have federal subject matter jurisdiction under either of these grounds.

DCC's contention that removal was allegedly proper under the "federal officer" statute is incorrect because none of the three required elements are present.

First, the fact that the Subject Vehicle's roof structure met some of the general, minimum federal standards imposed on all automotive manufacturers by the National Highway Traffic and Safety Administration ("NHTSA") does not convert DCC into a "federal officer." To the contrary, federal case law holds that a private corporation's mere participation in a federally-regulated industry is insufficient to establish "federal officer" jurisdiction. More importantly, the Savings Clause of the Federal Motor Vehicle Safety Act, 49 U.S.C. §§ 30101-30169 ("FMVSA"),[1] which creates NHTSA's authority, unequivocally states that mere compliance with the minimum standards does not relieve a manufacturer compliance from with state common law which requires vehicles to be designed in a reasonably safe manner.

_____
[1] The FMVSA's predecessor was originally codified at 15 U.S.C. §§ 1381-1431.

2

Second, DCC's wrongful acts made the basis of this suit (*i.e.* its defective design of the Subject Vehicle and defective warnings issued therewith) were not conducted under the control or orders of the U.S. Government. Consequently, if simply following the federal minimum standards were enough to make DCC a federal officer, which it is not, Plaintiff is not suing DCC for its mere compliance with those same standards, but for its failure to comply with the state common law requirement of designing its vehicles in a reasonably safe manner. Therefore, it cannot be credibly argued that DCC is sued for acts that were caused by the orders of the U.S. Government.

Third, DCC has asserted no "colorable federal defense" as defined by the "federal officer" removal statute. DCC's argument that the NHTSA minimum standards equate with the standard of care in the automobile manufacturing industry fails the "federal defense element" for three reasons: (1) the proposed rule argued by DCC is, if anything, a *state law* rule, not a "federal" rule; (2) the proposed rule argued by DCC, if anything, pertains to the duty element of a *prima facie* case, and is not an "affirmative defense"; and (3) DCC's argument is not "colorable" because state courts throughout this country uniformly hold that mere compliance with minimum government standards does not mean that the product was properly designed. Assuming arguendo that DCC asserts the affirmative defense of preemption, which DCC has not, this too is not a "colorable federal defense" as defined by the "federal officer" removal statute as: (1) federal case law holds that preemption is not the type of federal defense meant by the statute; (2) permitting the preemption defense to constitute a "colorable federal defense" for purposes of the "federal officer" removal statute, especially in the context of this case, would completely eviscerate the "well-pleaded complaint" rule; (3) the preemption defense is not "colorable" in this case because **no court** has ever held that the NHTSA minimum standards at issue in this case preempt state law personal injury claims; and (4) DCC has waived reliance on the preemption defense as a basis of federal jurisdiction because it was

3

not asserted in its removal notice. Consequently, DCC has failed to meet any of the elements of the "federal officer" removal statute.

DCC's arguments in support of federal diversity jurisdiction are equally meritless. The Chip Ellis Defendants' presence as party defendants defeats complete diversity because they are Alabama citizens as is the Plaintiff. DCC has not met its "high burden" of proof that the Chip Ellis Defendants have been fraudulently joined. Alabama state substantive law allows recovery for injured parties in products liability litigation against sellers of defective and unreasonably dangerous products under the AEMLD, common law negligence principals, common law wantonness principals, and the implied warranty of merchantability. While the plaintiff anticipates these claims will be disputed by the Chip Ellis Defendants, who did not join in the Notice of Removal of this action, DCC certainly has provided no proof to this Court that there is "no possibility" that the State Court could find Chip Ellis Defendants liable to the Plaintiff. As such, DCC has failed to meet its "high burden" of establishing that the Plaintiff has fraudulently joined the Chip Ellis defendants.

This Court lacks jurisdiction to hear this case as the "federal officer" removal statute has no application to the facts of this case and DCC has failed to meet its very high burden of establishing fraudulent joinder by clear and convincing evidence. Accordingly, the Plaintiff requests that this Court remand this action back to Macon County State Court.

## **Argument**

Federal courts are courts of limited jurisdiction, and, as such, they only have the power to hear cases that they have been authorized to hear by the Constitution or the Congress of the United States.[2] "Due regard for state governments' rightful independence requires federal courts

---

[2] *See* <u>Kokkonen v. Guardian Life Ins. Co. of Am.</u>, 511 U.S. 375, 377 (1994); <u>Burns v. Windsor Ins. Co.</u>, 31 F.3d 1092, 1095 (1994); <u>Wymbs v. Repub. State Exec. Comm.</u>, 719 F.2d 1072, 1076 (11th Cir. 1983).

scrupulously to confine their own jurisdiction to precise statutory limits."[3] As such, plaintiff has the right to have a case remanded back to state court when the federal court is without federal removal jurisdiction.[4] Because federal court jurisdiction is limited, the Eleventh Circuit favors remand of removed cases where federal jurisdiction is not absolutely clear.[5] In Section I, Plaintiff shows that this Court does not have federal removal jurisdiction of any part of this case under the federal officer removal statute. In Section II, Plaintiff shows that this Court does not have federal removal jurisdiction of this case on grounds of complete diversity of citizenship of the parties.

I.     **The "Federal Officer" Removal Statute Does Not Provide this Court with Subject Matter Jurisdiction.**

Section 1442(a)(1) states that a civil action commenced in a State court may be removed to federal district court if it is an action is against "any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office . . . ." Section 1442(a)(1) requires that a defendant prove: (1) that it acted as a "federal officer"; (2) that there is a "causal connection" between the conduct the defendant is sued for and the official authority; and (3) that it has a "colorable federal defense."[6] DCC, as the proponent of removal, has the burden of proving all of these elements.[7] A failure of any requires

---

[3] Ehling v. Nat'l Union Fire Ins. Co., 2007 WL 98722, *3 (M.D.Ala. Jan. 11, 2007)(Fuller, C.J.).

[4] 28 U.S.C. § 1447(c).

[5] See Burns, 31 F.3d at 1095.

[6] Jefferson Cty. v. Acker, 527 U.S. 423, 431 (1999)(requiring a "colorable federal defense" to a suit for "a[n] act under color of office" and "a 'causal connection' between the charged conduct and asserted official authority"); Mesa v. California, 489 U.S. 121, 125 (1989)(recognizing the 1442(a) requirement of "'person[s] acting under' an officer of the United States or any agency thereof' sued "for act[s] under color of such office"); King v. The Provident Bank, 428 F.Supp.2d 1226, 1331 (M.D.Ala.2006)(Fuller, C.J.).

[7] DCC correctly states that § 1442 should be more broadly construed than § 1441. See, e.g., Arizona v. Manypenny, 451 U.S. 232, 242 (1981)("the right of removal is absolute for conduct performed under color of federal office, and . . . the policy favoring removal should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1)")(internal quotations omitted). However, this rule may not be entirely relevant here, as it involves removal by actual federal officers, and not by private corporations like DCC attempting to invoke the protection of the statute. More applicable to the issue at hand is Freiberg v. Swinerton & Walberg Property Services, Inc., 245 F.Supp.2d 1144, 1150 (D.Colo.2002), which held that private actors seeking to assert the right of federal officer removal "bear a special burden of establishing the official nature of their activities." The Freiberg Court carefully analyzed the holdings of the Supreme Court regarding federal officer removal and found that the purpose of a broad reading of § 1442 is a "mistrust of states

remand.[8] Because DCC has not proven any of these requirements, the case should be remanded.

### A.    DCC Did Not Act as a "Federal Officer."

The first element is only met if the defendant can prove that a federal officer or agency directs its activities.[9] This Court has held that "[w]hether a defendant is acting under the direction of a federal officer depends on the **detail** and **specificity** of the federal direction of the defendant's activities and whether the government exercises **control** over the defendant."[10] DCC's contention that it is a "federal officer" just because it was required to follow 49 C.F.R. § 571.216 ("FMVSS 216", the federal minimum roof crush standard), an administrative regulation promulgated by the NHTSA pursuant to the FMVSA, is incorrect.[11] A corporation does not establish federal officer jurisdiction merely by showing participation in a regulated industry.[12] The test, which is sometimes termed as "regulation plus," has been articulated in many ways by the federal courts. In Venezia v. Robinson, 16 F.3d 209, 211-212 (7th Cir.1994), the Seventh Circuit articulated the test as follows -- a removing defendant must show that it effectively stands in the shoes of a federal employee and, as such, was required by the government to take actions that subjected it to liability under state law. Another court

---

and state courts to protect federal interests" and was inapplicable when the immunity of private corporations rather than federal officials was at issue. 245 F.Supp.2d at 1152 n.6; *see also* Garcia, The Boyle Festers: How Lax Causal Nexus Requirements and the "Federal Contractor Defense" Are Leading to a Disruption of Comity under the Federal Officer Removal Statute, 28 U.S.C. 1442(a)(1), 46 Emory L.J. 1629 (1997).

[8] Alsup v. 3-Day Blinds, Inc., 435 F.Supp.2d 838, 845 (S.D.Ill.2006); *In re* Wireless Tel. Radio Frequency Emissions Prods. Liab. Litig., 327 F.Supp.2d 554, 562 (D.Md.2004).

[9] Peterson v. Blue Cross/Blue Shield of Tex., 508 F.2d 55, 57 (5th Cir.1975).

[10] King, 428 F.Supp.2d at 1231 (Fuller, C.J.).

[11] DCC contends that there are other federal regulations that purportedly make it a "federal agent," but makes no effort to list them. (*See* Doc.1, p.4, n.1) Any reliance by DCC on any other federal regulation is waived. *See generally* Evans-Hailey Co. v. Crane Co., 207 F.Supp. 193 (M.D.Tenn.1962)(missing allegations may not be supplied, although defective allegations in a petition for removal may be amended); Iceland Seafood Corp. v. National Consumer Co-op. Bank, 285 F.Supp.2d 719 (E.D.Va.2003)(removing party could not amend its notice of removal that was made on grounds of diversity of citizenship by supplying missing allegation outside of 30-day period after service of process, although new ground for removal was independent grant of federal jurisdiction).

[12] King, 428 F.Supp.2d at 1231-1232 (Fuller, C.J.); Alabama Dental Ass'n v. Blue Cross and Blue Shield of Ala., Inc., 2007 WL 25488, *7 (M.D.Ala. Jan. 3, 2007)(Fuller, C.J.)(*quoting* Kennedy v. Health Options, Inc., 329 F.Supp.2d 1314, 1318 (S.D.Fla.2004)); City of Livingston v. Dow Chem. Co., 2005 WL 2463916, at *3 (N.D.Cal. Oct.5, 2005); *In re* Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig., 342 F.Supp.2d 147, 156 (S.D.N.Y.2004); Virden v. Altria Group, Inc., 304 F.Supp.2d 832, 844-845 (N.D.W.Va.2004); Tremblay v. Philip Morris, Inc., 231 F.Supp.2d 411, 418-419 (D.N.H.2002); Guillory v. Ree's Contract Serv., Inc., 872 F.Supp. 344, 347-348 (S.D.Miss.1994).

stated, "a defendant seeking to remove pursuant to § 1442(a) must provide 'candid, specific and positive' allegations that the conduct complained of was undertaken pursuant to the directions of a federal office or agency."[13] This Court has articulated that only when the defendant's challenged conduct "is closely linked to detailed and specific regulations" is federal officer removal proper.[14] Another court held that a corporation attempting to avail itself of federal officer removal jurisdiction must show that, through its conduct giving rise to liability, it was so "intimately involved with government functions as to occupy essentially the position of an employee."[15] Finally, yet another court has stated that the corporation must show that "at all times" it was "acting under express orders, control and directions of federal officers," and that its "involvement [in conduct giving rise to state-court liability] was 'strictly and solely at federal behest.'"[16] However, the "regulation-plus" test is articulated, DCC has not met it in this case.

Under the "regulation-plus" standard, manufacturers who have manufactured products **for** the U.S. Government pursuant to a **contract** under government-imposed designs and specifications have been successful in removing tort cases to federal court on the basis of "federal officer" removal. For example, the manufacturers of the Agent Orange chemical were entitled to remove the products

---

[13] Parks v. Guidant Corp., 402 F.Supp.2d 964, 967 (N.D.Ind.2005)(*quoting* Willingham v. Morgan, 395 U.S. 402, 409 (1969)); *see also* Colorado v. Symes, 286 U.S. 510, 518-519 (1932).

[14] King, 428 F.Supp.2d at 1231-1232 (Fuller, C.J.).

[15] Bakalis v. Crossland Savings Bank, 781 F.Supp. 140, 145 (E.D.N.Y.1991); *see also* Virden, 304 F.Supp.2d at 846 ("If the [private] actor is effectively an agent or employee of the government because its activities are controlled and funded by the government, it is entitled to the same jurisdictional protection as the government itself"); Kaplansky v. Associated YM-YWHA's of Greater N.Y., Inc., 1989 WL 29938, at *3 (E.D.N.Y. Mar.27, 1989)(parties complying with a subpoena were not "acting under" a federal officer because the defendants were not "asked to stand in the shoes of [federal] officers or agents and perform 'official' functions").

[16] Ryan v. Dow Chem. Co., 781 F.Supp. 934, 947 (E.D.N.Y. 1992)(*quoting* Camacho v. Autoridad De Telefonos De Puerto, 868 F.2d 482, 486 (1st Cir. 1989)); Akin v. Big Three Indus., Inc., 851 F.Supp. 819, 823-24 (E.D.Tex.1994)(finding federal officer jurisdiction proper "when a government contractor builds a product pursuant to [United States] Air Force specifications and is later sued because compliance with those specifications allegedly causes personal injuries"); Pack v. AC & S, Inc., 838 F.Supp. 1099, 1103 (D.Md.1993)(federal officer jurisdiction is established by showing that a removing defendant is subject to the "direct and detailed control" of a federal officer, meaning that the defendant must "show[ ] strong government intervention and the possibility that a defendant will be sued in state court as a result of the federal control"; direct control was proven where the government contracted with the removing defendant to build turbine generators under government specifications requiring use of asbestos cloth").

liability claims against it to federal court because the government "expressly issued detailed and direct orders to the defendants to supply a **certain product** . . . with the specifications for the [product] (and its packaging) **specifically dictated** by the government."[17] However, manufacturers like DCC who merely manufactured products for the general public and, in so doing, had to follow some general minimum federal regulations before placing those products on the market, do not establish "federal officer" removal.

Consider <u>Stanley v. Wyeth Inc.</u>, 2006 WL 2588147 (E.D.La. 2006), where the plaintiff asserted product liability claims against Sandoz on the theory that the drug Cordarone, which she ingested as prescribed for a non-life threatening heart condition but which actually caused severe liver complications as side effects from the drug. The Court soundly rejected Sandoz's argument that it was a "federal officer" on grounds that the claims were really an attack on the Federal Food and Drug Administration's ("FDA") decisions about the content of the label or the safety of the drug:

> Case law is clear that being a participant in a regulated industry is **insufficient** reason for a defendant to remove based on federal officer jurisdiction. Cases cited by Sandoz where private defendants were held to meet the § 1442(a)(1) standard of occupying "essentially the position of employees of the government" were those in which the **government contracted** with a private company for a service or product and then **exercised control** over the defendant's performance.

> Here the FDA has not contracted with Sandoz for the production of amiodarone. Although Sandoz may have *complied* with FDA regulations when it made the drug, the FDA never asked Sandoz to make or sell the drug. This situation is distinguishable and has been **consistently distinguished**, "[l]est participants in every regulated industry be entitled to 'federal officer' status." <u>Jamison</u>, [*infra*], is well-reasoned and addresses nearly identical arguments regarding federal officer status. The Court is persuaded by <u>Jamison</u>'s reasoning and holds similarly that Sandoz does not qualify as a "federal officer" under 28 U.S.C. § 1442(a)(1).[18]

The Court in <u>Jamison v. Purdue Pharma Co.</u>, 251 F.Supp.2d 1315, 1327 (S.D.Miss.2003), the case referred to above, similarly held:

---

[17] *See* <u>Winters v. Diamond Shamrock Chem. Co.</u>, 149 F.3d 387, 398 (5th Cir.1998).
[18] 2006 WL 2588147 at *2 (some citations omitted).

Drug manufacturers do not take governmental orders (or follow commands). True, their acts must conform to federal regulations, but they are under no duty, or direction to act . . . . [ These defendants] have neither shown nor suggested that their actions . . . were taken at the behest of a federal officer. Stated simply, they were not directed to act, either by law or by contract; they did so of their own volition. Accordingly, the integrity of the federal sovereign is not compromised by suit against them in state court.

Equally instructive is the holding in <u>Guckin v. Nagle</u>, 259 F.Supp.2d 406 (E.D.Pa. 2003), another drug liability case, where the Court relied on <u>Jamison,</u> requiring remand to State Court:

In marked contrast, [the drug manufacturer here] is not involved in a direct contract with the federal government to provide specified products and services to the government. Rather, [it] had the right to develop its product **as it chose**, but could only sell that product to the public if it complied with applicable government regulations. Thus, [the instant defendant], like the defendant in <u>Jamison</u>, acted merely a participant in a "highly regulated industry," a fact that does not provide a viable basis for removal under 28 U.S.C. § 1442.

Courts have equally refused to allow product defendants to claim they were "federal officers" simply because they complied with the regulations of United States Consumer Product Safety Commission ("CPSC") as was held in <u>Alsup v. 3-Day Blinds, Inc.</u>, *supra*. In that case the plaintiff brought state law product liability claims to address design defects in window blinds manufactured by the defendants that posed risk of strangulation to children and infants. The Court rejected the defendants' argument that, in cooperation with federal authorities, including the CPSC, they acted as "federal officers":

[W]hat [removing defendants] must establish for purpose of . . . § 1442(a)(1) is that the government authority under which they worked **required** them to act as they did," that is, "they must establish the [government's] direction and control of their activities **directly interfered** with their ability to fulfill their state law obligation[.]"[19] Correspondingly, "[c]ourts generally have not found jurisdiction where the

---

[19]  At this point, the Court cited <u>Faulk v. Owens-Corning Fiberglass Corp.</u>, 48 F.Supp.2d 653, 663 (E.D.Tex.1999)(holding that claims for alleged failure to warn arising from exposure to asbestos could not be removed in federal officer jurisdiction "[b]ecause the federal government provided no direction or control on warnings when using asbestos [and] did not prevent Defendants from taking their own safety precautions heeding state-law standards."); <u>Gauthe v. Asbestos Corp.</u>, 1997 WL 3255, at *3 (E.D.La. Jan.2, 1997)(finding federal officer removal improper because "[t]here is no evidence that the Government restricted or prohibited [defendant's] ability to notify individuals of the presence of asbestos in the work environment.").

government officer did not directly require a purported agent to take specific actions."

Federal officer removal is not supported by the bare fact of government approval of a defendant's action.[20] Similarly, it is not authorized by the fact that the government FDA may have furnished general guidance to a defendant.[21]

What a defendant seeking removal under 28 U.S.C. § 1442 must show is that the government **compelled it** to take an action for which the defendant is sought to be held liable in state court. In other words, the defendant must prove, "The government made me do it."[22]

. . .

The Court finds it impossible to conclude that [defendant] in effect stood in the shoes of a federal employee and was compelled to take actions that exposed it to liability. This case is a **very far cry** from the types of instances in which courts have permitted private corporations to remove cases to federal court in federal officer jurisdiction.[23] At most, [defendant] has shown that its business is subject to *some*

---

[20] At this point, the Court cited Parks, 402 F.Supp.2d at 968 (although the product of the FDA's "comprehensive regulatory authority over the production of medical devices" and "rigorous" regulation, held not to permit removal in federal officer jurisdiction); Northern Colo. Water Conservancy Dist. v. Board of County Comm'rs, 482 F.Supp. 1115, 1117-19 (D.Colo.1980)(where a federal agency exercised only the power to approve or disapprove pollution control plans developed by local governmental entities facing suits concerning the content of such plans, the entities were not "acting under" federal officers).

[21] At this point, the Court cited Russell v. Baxter Healthcare Corp., 2002 WL 975679, at *8 (E.D.La. May 10, 2002)("While the FDA licensed and regulated many of defendants' activities with respect to the production, manufacturing, [and] distribution [of blood-clotting agents] . . . , the federal involvement was not so invasive" so as to warrant federal officer removal); Ryan, 781 F.Supp. at 947 ("[A] person or corporation establishing only that the relevant acts occurred under the general auspices of a federal office or officer is not entitled to section 1442(a)(1) removal.").

[22] At this point, the Court cited MTBE Prods., 342 F.Supp.2d at 156 (holding that defendants had "sufficiently alleged that they added MTBE to gasoline at the direction of the [Environmental Protection Agency], a federal agency, thereby meeting the ['acting under'] requirement of removal pursuant to section 1442(a)(1)."); In re "Agent Orange" Prod. Liab. Litig., 304 F.Supp.2d 442, 449-50 (E.D.N.Y.2004)(companies that manufactured the herbicide Agent Orange for the United States were entitled to remove a products liability action brought in state court by a veteran who allegedly was injured due to Agent Orange exposure in Vietnam, where the companies were acting under a federal officer's directions because the government ordered specifications that differed from the companies' commercial applications and the method of warning and application was completely in the government's hands); Arness v. Boeing N. Am., Inc., 997 F.Supp. 1268, 1273-75 (C.D.Cal.1998)(in an action against government contractors based on the contractors' disposal of a toxic substance used to flush rocket engine hardware, holding that removal in federal officer jurisdiction was improper; government specifications required the defendants to clean the engines with a toxic substance, but did not specify how the defendants were to dispose of the cleanser, so that a federal officer did not direct or control the disposal of the toxin, and, thus, there was no connection between the plaintiffs' claims and the defendants' actions at the direction of a federal officer).

[23] At this point, the Court cited Blackman v. Asbestos Defendants (BHC), 1997 WL 703773, at *2 (N.D.Cal. Nov.3, 1997)(a corporation that contracted to manufacture solid rocket motors for the United States Air Force was entitled to remove in federal officer jurisdiction an asbestos-related personal injury case, since the Air Force directly controlled the design and development of the motors and required the use of asbestos materials in the manufacture of the motors); Winters v. Diamond Shamrock Chem. Co., 901 F.Supp. 1195, 1199 (E.D.Tex.1995)(holding that removal in federal officer jurisdiction by former manufacturers of Agent Orange was proper where "the Defense Department expressly directed chemical companies to provide a detailed mixture of chemicals known as Agent Orange" and "the defendants

regulation by the CPSC.

. . .

Finally, in holding that [defendant] is not a federal officer the Court is mindful of the basic purpose of 28 U.S.C. § 1442, which is to protect the work of federal officers from interference by state interests. In this instance there is no likelihood that allowing this action to proceed in state court will jeopardize the work of the CPSC. "[T]his is not a case where plaintiffs seek to challenge federal policy or official action in a state court forum. Rather, the plaintiffs challenge the conduct of a private corporation, acting without direction from a federal officer or agency. Allowing this action to be litigated in state court will not interfere with the course of the [agency's] duties nor its policies regarding the regulation of the [ ] industry." Correspondingly, though federal officer jurisdiction is read "expansively" in suits involving federal officials, it is read narrowly where, as in this instance, only the liability of a private company purportedly acting at the direction of a federal officer is at issue. Simply put, section 1442 should not be read to "allow for federal jurisdiction over virtually any participant in a regulated industry," thus creating "an unprecedented expansion of federal jurisdiction." The Court concludes that this action is due to be remanded to state court.

(some citations omitted).

Other product manufacturers have also attempted to use compliance with FDA regulations to assert that they were "federal officers" as was attempted in In re Guidant Corp. Implantable Defibrillators Prod. Liab. Litig., 428 F.Supp.2d 1014 (D.Minn.2006); where the plaintiffs brought wrongful death product liability tort claims against manufacturers of heart defibrillators. The Court rejected the manufacturers' arguments that federal officer removal was proper on grounds that, in designing, manufacturing, marketing, and distributing the medical devices at issue in these cases, they allegedly acted pursuant to rigorous federal regulations and under the continuous supervision and direction of the FDA:

---

were compelled under threat of criminal sanctions to deliver Agent Orange to the Defense Department."); Gulati v. Zuckerman, 723 F.Supp. 353, 358 (E.D.Pa.1989)(a defense contractor and its employees sued in state court for defaming the corporation's former president in various documents, including reports required by Department of Defense ("DoD") regulations and issued in response to the specific inquiries of DoD officials, was properly removed because the defamation action was "based upon actions taken pursuant to federal direction"); Overly v. Raybestos-Manhattan, 1996 WL 532150, at *4 (N.D.Cal. Sept.9, 1996)(failure-to-warn claims arising from alleged exposure to asbestos did not give rise to federal officer jurisdiction because the defendant's "only showing . . . relates to the government's manufacturing and engineering specifications"); Anderson v. Avondale Indus., Inc., 1994 WL 679827, at **3-4 (E.D.La. Dec.5, 1994)(removal was not proper where the defendant failed to prove that the federal government was involved in the design of *850 an allegedly defective product).

On the record before the Court, the FDA did not exercise control over Guidant's design, manufacture, or sale of the defibrillators at issue. The FDA required Guidant to submit information regarding the safety and efficacy of its products, but it did not control the manner in which Guidant created the devices. In addition, there is no link between the FDA's broad regulation of medical devices to the acts challenged in the Plaintiffs' complaints. Specifically, Guidant does not contend that the FDA directed the design, manufacture, or marketing of the defibrillators at issue in a manner that gave rise to the defects and deception alleged in Plaintiffs' complaints.

Moreover, Guidant's position would allow for federal jurisdiction over virtually any participant in a regulated industry. As the Federal District Court for the Northern District of Indiana aptly noted:

> Were the Court to find this case sufficient to invoke the federal officer removal statute, then there would be little to stop every medical device manufacturer-indeed, every drug manufacturer-sued in state court, and who cannot avail itself of diversity jurisdiction, from removing any garden-variety, products liability case to federal court. This would lead to an unprecedented expansion of federal jurisdiction.

Guidant has not demonstrated that it acted under the direction of a federal officer, nor has it demonstrated a causal connection between the alleged defects and deception and the FDA's regulatory authority. As such, no federal jurisdiction exists to support removal.[24]

The case of <u>Little v. Purdue Pharma, L.P.</u>, 227 F.Supp.2d 838 (S.D.Ohio 2002) is also instructive. In <u>Little</u>, the plaintiffs filed suit in state court against drug manufacturers for personal injuries allegedly arising from the use of the prescription drug Oxycontin. The drug manufacturers removed the case on several grounds, including the federal officer removal statute. The drug manufacturers argued that they qualified for federal officer removal because-much like this case-they were subject to "complex regulations, guidelines and evaluation schemes." The district court rejected this argument and granted plaintiffs' remand motion:

> The Court acknowledges the presence of federal oversight in the industry. . . . Nonetheless, neither [of the defendants have] demonstrated, or even suggested, that the involvement of the FDA in the day-to-day drug development and manufacturing

---

[24] 428 F.Supp.2d at 1017-1018 (citations omitted)(*citing* <u>Parks</u>, 402 F.Supp.2d at 970-971 (no federal officer removal jurisdiction existed in a case involving the alleged malfunction of a Guidant defibrillator because it did not act under the direction of the FDA in designing, manufacturing, or selling the medical device at issue, and that there was no link between the FDA regulation and involvement with the alleged malfunctions of the defibrillator).

process is as involved as that of the government officers in Pack [v. AC and S, Inc., 838 F.Supp. 1099, 1101 (D.Md.1993)]. The difference, the Court finds, is that whereas the defendants in Pack were operating under the terms of a federal contract, and thus the operative contractual commands of federal officials, corporate Defendants herein are operating at their own initiative. Drug manufacturers do not take governmental orders (or follow commands). True, their acts must conform to federal regulations, but they are under no duty, or direction, to act. The defendants in Pack and Gurda [Farms, Inc. v. Monroe County Legal Assistance Corp., 358 F.Supp. 841, 844 (S.D.N.Y.1973)], on the other hand, had their respective duties to act; they were directed to do what they did. Removal was permissible because the acts complained of were those in furtherance of such federal duties.[25]

Finally, consider as authority the Court's decision in Tremblay v. Philip Morris, Inc., *supra*, where it held:

[T]his is not a case where plaintiffs seek to challenge federal policy or official action in a state court forum. Rather, the plaintiffs challenge the conduct of a private corporation, acting without direction from a federal officer or agency. Allowing this action to be litigated in state court will not interfere with the course of the [agency's] duties nor its policies regarding the regulation of the [ ] industry.[26]

The previously cited cases are directly on point and mandate the remand of this case. NHTSA did not contract with DCC to build the subject vehicle; nor did NHTSA dictate its design. The only nexus between NHTSA and DCC is that DCC was required -- as are all automotive manufacturers -- to comply with federally mandated minimum roof strength standards. As is more fully articulated below, FMVSS 216 is only a minimum standard. As such, DCC was permitted to make its roots **stronger** than FMVSS 216, and, as this case will ultimately prove, it should have done so in order to comply with Alabama state common law standards.

DCC's reliance (Doc.1, pp.7-8) on Magnin v. Teledyne Continental Motor, 91 F.3d 1424 (11th Cir. 1996) for the proposition that it is a "federal officer" on grounds that "NHTSA delegates FMVSS testing and certification responsibility to the manufacturer" (Doc.1, p.7) is misplaced because the facts in Magnin are distinguishable from those of the instant case. In Magnin, the

---

[25] 227 F.Supp.2d at 861.

[26] 231 F.Supp.2d at 419.

plaintiff's decedent died in a plane crash, and the plaintiff asserted civil claims in Alabama state court against: (1) Teledyne Industries, the manufacturer of the airplane's engine, and (2) Smith, a Teledyne employee. The Magnin-plaintiff did not allege that the engine was defectively designed or bore defective warnings like the instant Plaintiff; instead, he alleged that the crash was caused by Teledyne's and Smith's negligent inspection and wrongful certification of the aircraft's engine as airworthy. The complaint expressly described Smith as a "designated manufacturing inspection representative" ("DMIR") of the Federal Aviation Administration ("FAA") that was required to certify engines as "airworthy" and that Smith signed the FAA's "Export Certificate of Airworthiness" for the aforesaid aircraft engine so that it was allowed to be exported in the defective condition. Smith had been designated by the Director of the FAA as DMIR, and as such he was a representative of the FAA with authority to perform its inspection and certification functions. The Administrator has made such delegations to DMIRs around the country, one of whom is Smith. Because Smith was sued solely for violating his federal duties as DMI, the Court held he was a "federal officer" and the case was properly removed:

> [The plaintiff] has argued to us that he never intended to pursue a claim against Smith for violating the federal law duties imposed upon him as a DMIR, but instead seeks only a determination that Smith was negligent in breaching a common law duty, or is otherwise liable for breaching a duty imposed by products liability law. [The plaintiff] asserts that his complaint identified Smith as a DMIR only as a factual matter, and not in order to state a claim against Smith under federal law. Putting aside for the moment Smith's use of his DMIR status as a defense, we cannot accept [the plaintiff's] post-hoc characterization of the complaint. The complaint is concise, and it would be unnatural to read the DMIR averments as unnecessary to any claim. Moreover, the breach of warranty claim is tied to the Export Certificate of Airworthiness, and the complaint avers that Smith signed that certificate in his capacity as DMIR.[27]

Here, unlike the situation in Magnin, the NHTSA's regulations do not create a federal office to conduct FMVSS 216 inspections; to the contrary, the regulation gives mere test parameters that

---

[27] 91 F.3d at 1428-1429.

manufacturers are supposed to use when determining if their vehicles pass this **minimum** standard.[28]

Nor has NHTSA appointed DCC as a federal officer to ensure that its roofs meet the standard. More

important, the instant Plaintiff has not sued DCC solely for breach of any such federal duties. To the

contrary, DCC is sued solely for manufacturing and selling a defective and unreasonably dangerous

product that it not fit for ordinary use. Courts have distinguished Magnin on this fact alone. In

Britton v. Rolls Royce Engine Services, 2005 WL 1562855 (N.D.Cal. 2005), another aircraft engine

defect case, the Court held that the rule from Magnin did not apply when the plaintiff does not base

his claims on a wrongful federal certification as did the Magnin-plaintiff:

> Magnin is factually distinguishable from this case, because plaintiffs' complaint here
> does not name any individual defendants, does not specifically identify DAI as a
> DMIR and does not expressly allege that defendant's issuance of an airworthiness
> certificate was a proximate cause of the accident; in fact, it makes no mention of any
> such certificate. [FN3]
>
>> FN3. The Court declines to read Magnin so broadly as to consider all
>> underlying conduct involved in airplane engine repair and maintenance in
>> determining whether a defendant may raise a colorable federal officer
>> defense. Assuming that every repair or maintenance inspection on an airplane
>> engine is eventually followed by issuance of a certificate of airworthiness,
>> then every airplane engine repair and maintenance mechanic could remove
>> to federal court even the simplest of negligence claims. Such a result seems
>> questionable, and the Court does not reach it.

(some citations omitted). Simply put, the Plaintiff in this case pursues solely Alabama state law

claims, and federal law is irrelevant to their success or failure. Indeed, under the FMVSA,

"[c]ompliance with any Federal motor vehicle safety standard issued under this subchapter does not

exempt any person from any liability under common law."[29] For all of these reasons, Magnin is

distinguishable. The first element of "federal officer" removal is not met.

> **B.    DCC Cannot Show a Causal Connection Between its Design of the Subject Vehicle and Any Alleged Official Federal Authority.**

---

[28] 49 C.F.R. § 571.216, S7.

[29] 49 U.S.C. § 30103(e)(*formerly* 15 U.S.C. § 1397(k)).

Unless a "federal officer" can justify what he did by reason of some official connection between the acts complained of and his official duties, the purpose of the statute to protect federal interests and immunities is **not implicated** and the proceeding is not removable.[30] The nexus/causation requirement is established by showing that the state action "has arisen out of the acts done by [the defendant] under color of federal authority and in enforcement of federal law."[31] "Critical under the statute is 'to what extent defendants acted **under federal direction**' at the time they were engaged in the conduct now being sued upon."[32] To sustain this burden, DCC must also "by direct averment exclude the possibility that [the state action] was based on acts or conduct of his not justified by his federal duty."[33]

Here, DCC mistakenly fails to apprehend the essence of the "under color" causal connection requirement. As many of the cases above articulate, DCC is not being sued because it followed federal regulations. It is being sued for unnecessarily and negligently creating design defects in its products and for failing to warn its customers of the associated dangers. What it must establish for purpose of the § 1442(a)(1) is that the government authority under which it allegedly worked **required it** to act as it did. However, while the FMVSS regulation at issue here, FMVSS 216, merely requires that a vehicle's roof not move more than 127 millimeters when a force equal to 1.5 times the unloaded vehicle weight is applied to the roof,[34] it did **not** require -- or even encourage -- DCC to merely design it to just withstand that test and nothing more. Paramount to a proper understanding of FMVSS 216 in particular (as well as the FMVSA as a whole) is that Congress defined NHTSA's regulations such as FMVSS 216 as "minimum standard[s] for motor vehicle

---

[30] <u>Brenner v. Kelly</u>, 201 F.Supp. 871 (D.Minn.1962).

[31] <u>Mesa</u>, 489 U.S. at 131-132 (*quoting* <u>Maryland v. Soper</u>, 270 U.S. 9, 33 (1926)).

[32] <u>Ryan</u>, 781 F.Supp. at 946 (*quoting* <u>Gurda Farms</u>, 358 F.Supp. at 844).

[33] <u>Mesa</u>, 489 U.S. at 132.

[34] 49 C.F.R. § 571.216, S5.

performance or motor vehicle equipment performance."[35] The FMVSA's "savings clause" states that provides that "[c]ompliance with any Federal motor vehicle safety standard issued under this subchapter **does not exempt** any person from any liability under common law."[36] In interpreting this savings clause, the U.S. Supreme Court held in <u>Geier v. American Honda Motor Co.</u>, 529 U.S. 861, 870 (2000), that Congress intended this provision to "preserve" tort claims "that seek to establish greater safety than the minimum safety achieved by a federal regulation intended to provide a floor." Indeed, federal courts that have construed FMVSS 216 have held that it "did no more than establish a minimum standard"; in other words, "it did not presume to lay down a template for proper roof design."[37]

Thus, even if DCC was transformed into a "federal officer" merely because it had to follow FMVSS 216 (which it was not), DCC cannot argue that FMVSS 216 caused it to minimally meet the 127 millimeter standard and nothing more. Because the FMVSA savings clause makes FMVSS 216 a "floor," and not a "ceiling," DCC's alleged "federal authority" did not require it to design and manufacture the roof below the Alabama state common law standard. Thus, the second element of "federal officer" removal is not met.

**C.    DCC Does Not Have a "Colorable Federal Defense."**

Finally, DCC's contention that "[a] manufacturer cannot be viewed to have wantonly failed to warn of defects in a system which it subjected to federal testing and implemented because it complied with those tests" (Doc.1, p.7) is not a "colorable federal defense" under the "federal officer" removal statute. First, DCC's cited cases do not articulate any affirmative *defense*. Second, the rules stated therein do not turn on *federal* law. To the contrary, the cases cited by DCC,[38] if anything,

---

[35] 49 U.S.C. § 30102(a)(9)(*formerly* 15 U.S.C. § 1391(2)).

[36] 49 U.S.C. § 30103(e)(*formerly* 15 U.S.C. § 1397(k)).

[37] *See* <u>Sours v. General Motors Corp.</u>, 717 F.2d 1511 (6th Cir. 1983).

[38] *See e.g.* <u>Richards</u>, *infra*; *and* <u>Miles v. Ford Motor Co.</u>, 922 S.W.2d 572 (Tex. Appl. Texarkana 1996).

discuss only a *state law* rule concerning the duty of care element that the plaintiff must establish to prove a *prima facie* case. These two reasons are, in and of themselves, enough to show that DCC has not met element three. However, there is a third reason that the cases it cites do not establish the "colorable federal defense" element of "federal officer" removal -- DCC's stated rule from the cases is opposite of what the cited cases hold.

In DCC's first cited case, <u>Richards v. Michelin Tire Corp.</u>, 21 F.3d 1048, 1059 (11th Cir. 1994), was an automotive products liability case that was pending in federal court pursuant to its diversity jurisdiction. As such, the Court was required by <u>Erie R.R. Co. v. Tompkins</u>, 304 U.S. 64 (1938) to evaluate the product liability tort claims pursuant to Alabama **state law**. In discussing whether or not the plaintiff met his ***prima facie* case** on his wanton failure to warn claim, the Eleventh Circuit stated:

> [Ford's] compliance with both federal regulations and industry practices is some evidence of due care. <u>Elliot v. Brunswick Corp.</u>, 903 F.2d 1505, 1508 (11th Cir. 1990) . . . ; <u>Dunn v. Wixom Bros.</u>, 493 So.2d 1356, 1359-60 (Ala. 1986).[fn21]
>
> > [fn21] We **decline to accept** the invitations of [Ford] and Amici to hold that compliance with 49 C.F.R. § 571.119 precludes a finding of wantonness.
>
> We have repeatedly held that the issue of punitive damages should not go to the jury when a manufacturer takes steps to warn the plaintiff of the potential danger that injured him; such acts bar a finding of wantonness. In this case, the record demonstrates that [Ford] complied with all requisite Federal Motor Vehicle Safety Standards, including Standard 119, which requires that "sufficient information [be placed] on the tires to permit their proper selection and use." . . . As shown, [plaintiff] has not demonstrated sufficient evidence of wantonness on his failure to warn claim. Because [plaintiff] similarly failed to demonstrate sufficient evidence on his wanton design claim, JNOV should be granted in [Ford's] favor with respect to [plaintiff's] wantonness cause of action.

(some citations omitted). Thus, while <u>Richards</u> discussed a unique twist in Alabama state law, it cannot be cited in support of any "federal defense." Contrary to DCC's contentions, the Eleventh Circuit **refused** to hold that mere compliance with NHTSA standards precludes a finding of

wantonness. More important, unlike Standard 119 at issue in <u>Richards</u>, FMVSS 216 **does not** require a warning. Thus, DCC's alleged "defense" is meritless in this case at every turn.

Nor do the <u>Elliot</u> or <u>Dunn</u> cases cited by the <u>Richards</u> panel articulate any "federal defense." Quite the opposite, these cases hold **against** the premise cited by DCC. In <u>Elliott</u>, another Alabama state law products liability case proceeding in federal court under its diversity jurisdiction, the Eleventh Circuit again discussed the plaintiff's burden of proof in establishing his ***prima facie* case** under the contours of **Alabama's substantive** products liability law:

> [The plaintiff] argues, however, and we agree, that a manufacturer's proof of compliance with either industry-wide practices, or even federal regulations, fails to eliminate conclusively its liability for its design of allegedly defective products. *See e.g.*, <u>Dunn v. Wixom Bros.</u>, 493 So.2d 1356 (Ala. 1986); <u>General Motors Corp. v. Edwards</u>, 482 So.2d 1176, 1198 (Ala. 1985). We do not, naturally, dismiss a manufacturer's compliance with industry standards, but we must also remember that those standards may sometimes merely reflect an industry's laxness, inefficiency, or inattention to innovation. As Judge Learned Hand stated in <u>The T.J. Hooper</u>, 60 F.2d 737, 740 (2d Cir. 1932):
>
> > A whole calling may have unduly lagged in the adoption of new and available devices. It never may set its own test, however persuasive be its usages. Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission.[39]

Nor did the Alabama Supreme Court in <u>Dunn</u> case discuss any "federal defense"; to the contrary, it merely discussed the parameters of the manufacturer's duty for a plaintiff to establish in his *prima facie* case and the effect that government or industry standards have upon that duty under Alabama state law.[40] In <u>Dunn</u>, the Court reversed a defense verdict because the trial judge instructed the jury that the manufacturers were only required to do what "other manufacturers doing the same type of

---

[39] 903 F.2d at 1508-1510 (citations omitted).

[40] <u>Dunn.</u>, 493 So.2d at 1360 ("[t]he 'duty to warn' charge taken from the Alabama Pattern Jury Instructions (contained in the last sentence of the first paragraph of the above-quoted portion of the trial court's instructions) is a correct statement of the law. A.P.J.I. Civil § 32.07. But, as the authority cited under 'References' to § 32.07 indicates, proof of industry practices, though admissible for the jury's consideration in its application of the 'reasonable care' standard, cannot conclusively establish the defendant's duty as a matter of law").

business that the defendants are doing." The <u>Dunn</u> Court's rule was "proof of industry practices, though admissible for the jury's consideration in its application of the 'reasonable care' standard, cannot conclusively establish the defendant's duty as a matter of law."[41] Finally, the <u>Edwards</u> case discussed by the Eleventh Circuit in <u>Elliot</u> is even more explicit; it states quite succinctly:

> . . . that federal safety standards, such as the National Traffic and Motor Vehicle Safety Act of 1966, and the regulations promulgated pursuant thereto, do not preempt or prohibit suits, like the present one, brought in state court under common law causes of action. In fact, proof of compliance with federal highway safety standards, while it may be admitted as evidence that a vehicle is not defective, is not conclusive and, therefore, **does not provide a defense** to state law claims. As a result, juries, like the one in this case, are charged with the awesome responsibility of deciding, on a case by case basis, the reasonableness of an automobile's design. Such complex decisions, which must be made upon the limited information made available to the jurors within the constraints of the judicial system, have potential national implications. We *could* hold that the standards set by the federal government, which has the resources necessary to conduct tests to determine whether or not a design is unreasonably dangerous, are conclusive. We **refuse** to so hold. Whether federal standards should be conclusive in "crashworthiness" cases is not a decision for this Court to make. Such a decision, if made, would have to be made by the appropriate legislative body.[42]

The "appropriate legislative body" to which the Alabama Supreme Court referred is, undoubtedly, the Alabama legislature, which has chosen not to modify the tort law from what is articulated above. While other States have created **state-law** defenses or presumptions against liability when a manufacturer merely complies with minimum federal regulations, the Alabama Legislature (quite wisely) has not. While a defense need only be "colorable" to sustain a claim of federal officer

---

[41] *See also* <u>Klein v. Mr. Transmission, Inc.</u>, 294 Ala. 437, 318 So.2d 676 (1975)(customary practices or standards do not furnish a conclusive test of negligence)(*quoting* 65 C.J.S., <u>Negligence</u>, § 16 ("customary methods or conduct do not furnish a test which is conclusive or controlling on the question, and negligence may exist notwithstanding the conduct pursued or the methods adopted were in accordance with those customarily pursued or adopted")); <u>Macon County Com'n v. Sanders</u>, 555 So.2d 1054, 1057 (Ala. 1990)("[t]he standard to be applied is what reasonably should have been done, not what customarily is done").

[42] <u>Edwards</u>, 482 So.2d at 1198; *see also* <u>Frantz v. Brunswick Corp.</u>, 866 F.Supp. 527 (S.D.Ala.1994)(Hand, J.)("compliance with industry standards is not, and should not be, a complete defense to a products liability cause [because] it may indicate a failure on the part of an entire industry"); <u>Scott v. ABF Freight Systems, Inc.</u>, 306 F.Supp.2d 1169, 1174 (M.D.Ala. 2004)(Albritton, J.)("[b]ecause evidence of industry custom is not dispositive, [defendant's] evidence that it loaded the freight in accordance with the manufacturer's instructions and in a manner consistent with industry practice, while it may ultimately be given weight by the jury, does not entitle it to summary judgment").

jurisdiction, as stated by one court, "by the same token, the Court does **not** equate a federal defense that is merely colorable with one that is hopeless."[43]

Although not couched as such in its removal notice, DCC repeated contention that it "[did not] warn of any defect in its design system because the roof's compliance with [FMVSS] 216 indicated that none was necessary" (Doc.1, p.8)[44] is nothing but an attempt to assert the affirmative defense of *preemption*. DCC does not assert that preemption constitutes a "colorable federal defense" under the meaning of § 1442(a)(1) because such an argument would **fail** for four reasons.

**First**, preemption is not a defense "arising out of [a federal officer's] official duties" and therefore cannot support jurisdiction under § 1442(a).[45] Indeed, it has been held that the basic purpose of § 1442 is to ensure a federal forum for defenses of official **immunity** by federal officers.[46] As one court noted, federal officer removal is rooted in "an anachronistic mistrust of state courts' ability to protect and enforce federal **interests** and **immunities** from suit."[47] For example, the federal government is generally immune from suit based on the design of military equipment because the appropriate design involves "not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness"; such immunity is likewise extended to insulate a government contractor when the government removes a contractor's discretion and mandates

---

[43] Alsup, 435 F.Supp.2d at 853.

[44] *See also* Removal Notice (Doc.1) p.6 ("[i]n implementing the roof design for the 2000 Chrysler Cirrus, DCC followed every aspect of the testing directions contained in [FMVSS 216]. Moreover, it was on the basis of those tests that DCC determined that the roof design of 2000 Chrysler Cirrus was safe and thus, there was no need to warn of the danger complained of by plaintiff").

[45] Blahnik v. BASF Corp., 2006 WL 2850113, n1 (S.D.Tex. Oct. 3, 2006)(*citing* Arizona, 451 U.S. at 241-242).

[46] *See* Willingham, 395 U.S. at 407 ("[O]ne of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court."); Wisconsin v. Schaffer, 565 F.2d 961, 964 (7th Cir.1977)("The purpose of the removal statute is to insure a federal forum for cases where federal officials must raise defenses arising out of their official duties.").

[47] Freiberg, 245 F.Supp.2d at 1150.

construction under strict specifications.[48] The public policy justifications underlying this immunity was set forth by the U.S. Supreme Court as follows:

> The Federal Government . . . can act only through its officers and agents, and they must act within the States. If, when thus acting, and within the scope of their authority, those officers can be arrested and brought to trial in a State court, for an alleged offense against the law of the State, yet warranted by the Federal authority they possess, and if the general government is powerless to interfere at once for their protection -- if their protection must be left to the action of the State court -- the operations of the general government may at any time be arrested at the will of one of its members.[49]

The affirmative defense of preemption does not fall under this type of immunity.

**Second**, DCC's reliance on any alleged preemption defense as its "colorable federal defense" would, as a practical matter, run-afoul of the U.S. Supreme Court's "well-pleaded complaint" rule, which provides that federal question jurisdiction cannot be based upon the mere presence of the affirmative defense of preemption.[50] While the "complete preemption" doctrine provides a narrow exception to this rule when "the pre-emptive force of a [federal] statute is so extraordinary that it converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule."[51] the U.S. Supreme Court has found complete preemption under two federal statutes: (1) the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185 and (2) the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a).[52] The federal courts are uniform, however, that the FMVSA does not completely preempt all claims relating to motor

---

[48] Arizona, 451 U.S. at 241 n16; *see also* Boyle v. United Techs. Corp., 487 U.S. 500, 512 (1988)("[i]t makes little sense to insulate the Government against financial liability for the judgment that a particular feature of military equipment is necessary when the Government produces the equipment itself, but not when it contracts for the production").

[49] *Quoting* Tennessee v. Davis, 100 U.S. 257, 263 (1880); *see also* Soper, 270 U.S. at 32 ("The constitutional validity of the section rests on the right and power of the United States to secure the efficient execution of its laws and to prevent interference therewith, due to possible local prejudice, by state prosecutions instituted against federal officers in enforcing such laws, by removal of the prosecutions to a federal court to avoid the effect of such prejudice.").

[50] Caterpillar, Inc. v. Williams, 482 U.S. 386, 393 (1987).

[51] Blab T.V. of Mobile v. Comcast Cable Comm., 182 F.3d 851, 854 (11th Cir. 1999).

[52] Caterpillar, 482 U.S. at 393-394; Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 64-65 (1987).

vehicle safety.[53] Yet if this Court were to follow DCC's arguments to their illogical conclusion, then "federal officer" removal, would be appropriate in virtually every field where there is federal regulation and, the well-pleaded complaint rule would be abolished. This would result in the literal flooding of federal courts with not only every automotive products liability action imaginable, but with every other state law tort claim which somehow involved an issue of federal regulation. In the extreme, this would require federal courts to assert "federal officer" jurisdiction over matters involving virtually every conceivable claim where federal regulations were involved, no matter how disconnected, this Court should not so hold.

**Third**, even if preemption were a "federal defense" for purposes of § 1442(a)(1) (which it is not), FMVSS 216 simply does not preempt state tort law products liability lawsuits like the one in the instant case.[54] As stated above, "the Court does **not** equate a federal defense that is merely colorable with one that is hopeless."[55]

**Fourth**, DCC neither asserted preemption as its alleged "colorable federal defense" in its removal notice, nor as a separate ground for removal. A notice of removal may be amended more than thirty days after the time to remove has expired "only to set out more specifically the grounds for removal that already have been stated, albeit imperfectly, in the original notice"; "[c]ompletely new grounds for removal jurisdiction may not be added and missing allegations may not be

---

[53] Burgo v. Volkswagen of America, 183 F.Supp.2d 683, 690 (D.N.J. 2001); Campbell v. General Motors Corp., 19 F.Supp.2d 1260, 1273 (N.D.Ala. 1998)("The [Safety Act] fails each and every one of these tests [for application of the complete preemption doctrine]."); Richards v. Michelin Tire Corp., 786 F.Supp. 959, 962-963 (S.D.Ala. 1992)(Congress did not intend Safety Act to occupy the entire regulatory field of automotive safety; no court has held otherwise in all the years since its enactment); Coardes v. Chrysler Corp., 785 F.Supp. 480, 482 n. 3 (D.Del. 1992); Amrhein v. Quaker Oats Co., 752 F.Supp. 894, 896-97 (E.D. Mo. 1990) (express language in savings clause and legislative history do not support finding that Congress intended Safety Act to completely preempt state law claims); Talalai v. Cooper Tire & Rubber Co., 2001 WL 1877265 at *8 (D.N.J. Jan.9, 2001); Lennon v. Bridgestone/Firestone, Inc., 2000 WL 1570645 at *3 (E.D.Pa. Oct. 19, 2000); Beatty v. Bridgestone/Firestone, Inc., 2000 WL 1570590 at *3 (E.D.Pa. Oct. 19, 2000); Carden v. Bridgestone/Firestone, Inc., 2000 WL 33520302 at *3 (S.D.Fla. Oct.18, 2000); Farkas v. Bridgestone/Firestone, Inc., 2000 WL 1425018 at *4 (W.D.Ky. Sept.22, 2000).

[54] See Sours v. General Motors Corp., 717 F.2d 1511 (6th Cir. 1983).

[55] Alsup, 435 F.Supp.2d at 853.

furnished, however."[56] In other words, substantive amendments to a notice of removal may not be made after the thirty-day period specified in 28 U.S.C. § 1446(b).[57] Because DCC's removal petition does not mention preemption and the thirty day period has long passed, any reliance on the preemption doctrine has been waived.[58]

Because DCC cannot establish any of the three elements of "federal officer" removal, the case should be remanded to State Court.

## II.    The Federal General Removal Statute and the Diversity Jurisdiction Statute Do Not Provide this Court with Subject Matter Jurisdiction.

DCC's reliance on the general removal statute and the diversity jurisdiction statute for federal subject matter jurisdiction is also misplaced. Section 1441 is to be construed narrowly with all doubts concerning the propriety of removal resolved against the removing party (DCC) and in favor of remand.[59] Succinctly stated by the Eleventh Circuit, "where plaintiff and defendant clash about jurisdiction, uncertainties are resolved in favor of remand."[60] To meet § 1332(a)(1), not only must a plaintiff be a citizen of a state other than the state of which one defendant is a citizen, but also, under the rule of "complete diversity," no plaintiff may share the same state citizenship with any defendant.[61] There is not "complete diversity" in this case because the Plaintiff and the Chip Ellis Defendants are both "citizens" of Alabama. As such, § 1332(a)(1) does not provide this Court with

---

[56] 14C Wright, *et al.*, Federal Practice & Procedure § 3733; Iceland Seafood, 285 F.Supp.2d at 726-727; Tincher v. Insurance Co. of Pa., 268 F.Supp.2d 666, 667-68 (E.D.Va.2003); *In re* Petition to Detach Prop., 878 F.Supp. 111, 112-113, n1 (N.D.Ill.1995); Castle v. Laurel Creek Co., 848 F.Supp. 62, 66-67 (S.D.W.Va.1994).

[57] *See* Barrow Dev. Co. v. Fulton, Ins., 418 F.2d 316, 317 (9th Cir.1969)(notice of removal can be amended after 30 day period only where party seeks to correct defects in form but not to add allegations of substance); O'Halloran v. Univ. of Washington, 856 F.2d 1375, 1381 (9th Cir.1988); Energy Catering Services, Inc. v. Burrow, 911 F.Supp. 221, 223 (E.D.La.1995).

[58] Britton, *supra* ("[s]ince defendant DAI's preemption argument was first made in its May 6, 2005 Opposition brief, defendant has exceeded the 30-day period for amending its March 14, 2005 Notice of Removal").

[59] Diaz v. Sheppard, 85 F.3d 1502, 1505 (11th Cir.1996).

[60] Burns, 31 F.3d at 1095.

[61] Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267 (1806).

federal subject-matter jurisdiction.

DCC's contention that the Chip Ellis Defendants have been "fraudulently joined" and that their citizenship must be disregarded for purposes of determining jurisdiction" (Doc.1, pp.10-16) is incorrect. The term "fraudulent joinder" is a term of art, not reflecting on the integrity of the plaintiff or plaintiff's counsel, but merely rubric applied when a court finds either that no cause of action against a non-diverse defendant exists.[62] The Eleventh Circuit has given three scenarios where a defendant has been fraudulently joined: (1) when there is no possibility the plaintiff could establish a cause of action against the resident defendant in state court; (2) when the plaintiff fraudulently pleaded jurisdictional facts; or (3) when a diverse defendant is joined with a nondiverse defendant as to whom there is no joint, several or alternative liability and the claim has no real connection to the claim against the nondiverse defendant.[63] DCC's bases its arguments solely on the first avenue, claiming that there is no possibility that Plaintiff can establish any cause of action against the Chip Ellis Defendants. DCC cannot meet this burden.

DCC, being the removing party, bears the burden of demonstrating that the joinder of a non-diverse party was fraudulent.[64] This Court has held that the burden "is a **heavy** one."[65] Several reasons justify this description. First, a claim of fraudulent joinder must be supported by clear and convincing evidence.[66] Second, in evaluating whether there has been fraudulent joinder, all factual *allegations* **and** *submissions* must be viewed in the light most favorable to the plaintiff.[67] Third, "the district court should resolve all questions of . . . controlling law in favor of the plaintiff."[68] Fourth,

---

[62] *See* Lewis v. Time, Inc., 83 F.R.D. 455 (E.D. Cal. 1979), *aff'd* 710 F.2d 549 (9th Cir. 1979).

[63] *See* Triggs v. John Crump Toyota, 154 F.3d 1284, 1287 (11th Cir. 1998).

[64] Pacheco de Perez v. AT & T Co., 139 F.3d 1368, 1380 (11th Cir.1998).

[65] Davis v. General Motors Corp., 353 F.Supp.2d 120, 1207 (M.D.Ala. 2005)(Fuller, C.J.); Faulk v. Smithkline Beecham Corp., 2005 WL 2179773 (M.D.Ala. 2005)(Fuller, C.J.).

[66] *See* Parks v. New York Times Co., 308 F.2d 474, 478 (5th Cir.1962).

[67] *See* Crowe v. Coleman, 113 F.3d 1536, 1538 (11th Cir. 1997).

[68] Cabalceta v. Standard Fruit Co., 883 F.2d 1553, 1561 (11th Cir.1989).

there is no fraudulent joinder if "there is even a possibility that a state court would find that the complaint states a cause of action against . . . the resident defendant[ ]."[69] Fifth, the Eleventh Circuit has held that a plaintiff may defeat an allegation of fraudulent joinder **even if** the plaintiff **cannot survive** summary judgment under the facts at the time of removal; "the district court is to stop short of adjudicating the merits of cases that do not appear readily to be frivolous or fraudulent."[70] All in all, "[t]he plaintiff **need not** have a winning case against the allegedly fraudulent defendant; he need only have a **possibility** of stating a valid cause of action in order for the joinder to be legitimate." _Id._

Here, Plaintiff's complaint asserts AEMLD, negligence, wantonness, and implied warranty claims against the Chip Ellis Defendants. Alabama law permits products liability litigants like Plaintiff to present all of these claims to the jury, whether together or in the alternative.[71] If there is possibility that the State Court would find that even **one** of these claims states a cause of action, DCC's fraudulent joinder arguments fail, and the entire case should be remanded back to State Court.[72] Here, not just one, but **all** of Plaintiff 's claims pass the fraudulent joinder test.

A.    **The AEMLD Claims.**

Contrary to DCC's suggestion, the AEMLD not only applies to manufacturers of products, but also to **all sellers** within the distributive chain. In the seminal AEMLD case, the Alabama Supreme Court held:

---

[69] Triggs, 154 F.3d at 1287 (_quoting_ Coker v. Amoco Oil Co., 709 F.2d 1433, 1440 (11th Cir.1998)).

[70] Crowe, 113 F.3d at 1541-1542.

[71] Vesta Fire Ins. v. Milam & Co. Constr., 901 So.2d 84, 102-103 (Ala. 2004)(_citing and quoting_ A.R.C.P. 8(e)(2)("[a] party may set forth two or more statements of a claim or defense alternatively or hypothetically, either in one count or defense or in separate counts or defenses. When two or more statements are made in the alternative and one of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of one or more of the alternative statements. A party may also state as many separate claims or defenses as the party has regardless of consistency and whether based on legal or on equitable grounds, or on both")).

[72] _See_ Fitts v. Griffin, 304 F.Supp.2d 1337, 1345-1346 (M.D.Ala.2004)(Albritton, J.)("[i]f there is a possibility a state court would find that either the Plaintiffs negligence or wantonness claim states a cause of action against the non-diverse defendant, then this court is required to find that joinder was proper and remand the case to state court").

> We now extend the doctrine of "manufacturer's liability," and by definition this doctrine shall include not only the manufacturer, **but also** the **supplier** and the **seller**. We do not intend to impose a no-fault concept. On the other hand, we adhere to the tort concept of fault. Under the "extended manufacturer's liability doctrine," we opine that a manufacturer, or **supplier**, or **seller**, who markets a product not reasonably safe when applied to its intended use in the usual and customary manner, constitutes negligence **as a matter of law**.[73]

Therefore, to succeed on his AEMLD claims against the Chip Ellis Defendants, Plaintiff does not have to prove at trial that they acted with negligence as long as he proves that the Subject Vehicle they sold was defective and unreasonably dangerous. In its removal notice, DCC does **not** contend that the Subject Vehicle is not defective and unreasonably dangerous; indeed, DCC does not contest that Plaintiffs can prove a *prima facie* AEMLD case against the Chip Ellis Defendants.[74] Its sole ground in support of its fraudulent joinder argument on the AEMLD claims is that the Plaintiff allegedly cannot defeat a "no causal relation" affirmative defense if asserted by the Chip Ellis Defendants. (*See* Doc.1, pp.13-15)

True, one of the "allowable defenses" mentioned in <u>Casrell</u> and its companion-case[75] is the "no causal relation" affirmative defense. The Alabama Supreme Court set-forth the elements of the defense as follows:

> To avail itself of the no-causal relation defense, [a supplier or seller] must show [1] that he was in the business of distributing or processing for distribution finished products; [2] that he received the product already in a defective condition; [3] that he did not contribute to this defective condition; and [4] that he had neither knowledge of the defective condition nor an opportunity to inspect the product that was superior

---

[73] <u>Casrell v. Altec Industries, Inc.</u>, 335 So.2d 128, 132-133 (1976); *see also* <u>Caudle v. Patridge</u>, 566 So.2d 244, 247 (Ala. 1990)("<u>Casrell</u> expanded the manufacturer's liability doctrine of earlier cases to include not only the manufacturer but also the supplier and seller").

[74] A *prima facie* AEMLD case is proven when the plaintiff can show he suffered injury or damages to himself or his property by one who sells a product in a defective condition unreasonably dangerous to the plaintiff as the ultimate user or consumer, if the seller is engaged in the business of selling such a product and it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold. <u>Casrell</u>, 335 So.2d at 132-133. Showing these elements, the plaintiff has proved a *prima facie* case although (1) the seller has exercised all possible care in the preparation and sale of his product and (2) the user or consumer has not bought the product from, or entered into any contractual relation with, the seller. <u>Id.</u>

[75] *E.g.* <u>Atkins v. American Motors Corp.</u>, 335 So.2d 134, 143 (Ala. 1976).

to the knowledge or to the opportunity of the consumer.[76]

Consider Caudle v. Patridge, *supra*, where a seller in the business of selling and installing "conversion kits" to change a 2-wheel drive vehicle into a 4-wheel drive vehicle "did not contribute to the defective condition of the conversion kit" it sold that injured the plaintiff. Nevertheless, our Supreme Court denied the seller summary judgment on the no-causal-relation defense because it "at the very least, [had] a **superior knowledge** of the nature of converted trucks."

DCC sharply criticizes the undersigned for failing to "put forth *evidence* that [the] Chip Ellis [Defendants] had any knowledge of the alleged defect." (*See* Doc.1,p.15) However, under Alabama law, plaintiffs are not required to produce *evidence* in support of their claims, much less evidence to refute an as-yet-unasserted **affirmative defense**. A plaintiff's complaint must only set forth a short and plain statement of the claim. Even an itemized listing of facts supporting each element of his AEMLD claim is not required because:

> [u]nder [Rule 8(a)] the prime purpose of the pleadings is to give **notice**. Such common law concepts as stating the facts each party believes to exist and narrowing the issues that must be litigated are **completely abandoned**. The distinction between "ultimate facts" and "evidence" or conclusions of law are no longer important since the proposed new rules do not prohibit the pleading of facts or legal conclusions as long as fair notice is given to the parties. These rules abolish the doctrine of "theory of pleading." "A simple statement in sequence of the events which have transpired, coupled with a direct claim by way of demand for judgment of what the plaintiff expects and hopes to recover, is a measure of clarity and safety; . . . .[77]

Moreover, facts concerning the specific defects in a product in a products liability claim is not one of the subject-areas that must be pleaded with specificity under Rule 9(b).[78] Thus, it is especially

---

[76] Caudle v. Patridge, 566 So.2d 244, 248 (Ala. 1990).

[77] A.R.C.P. 8, Committee Comments.

[78] *See also* Key v. Maytag Corp., 671 So.2d 96, 97-98 (Ala. Civ. App. 1995)(although products liability complaint is less than clear, it was sufficient because it states causes of action against Magic Chef for negligence, wantonness, and liability under the AEMLD); Knight v. Burns, Kirkley & Williams Const. Co., Inc., 331 So.2d 651 (1976)(pleading a general negligence claim is a sufficient pleading even all the negligent acts are not specified in the complaint)(*citing* Watwood v. R.R. Dawson Bridge Co., Inc., 293 Ala. 578, 307 So.2d 692 (1975)); Fraternal Order of Police, Strawberry Lodge No. 40 v. Entrekin, 314 So.2d 663, 672-673 (Ala. 1975)("[t]he pleading rules are designed to eliminate delay, and reduce the pleading requirements to a minimum. They are implemented by and depend upon pretrial procedure for the

illogical for DCC to contend that Plaintiff was somehow required to state detailed facts that negate the existence of each and every affirmative defense to every claim in his complaint. On the contrary, it is the **defendant** that is required to specifically plead affirmative defenses in its answer in order to preserve them.[79] Plaintiff's complaint conforms and -- if anything -- **exceeds** Alabama's Official Authorized Forms for pleading tort causes of action. The Forms contained in the Alabama Rules of Civil Procedure "are intended to indicate the simplicity and brevity of statement which the rules contemplate."[80] A litigant's compliance with the Forms is "sufficient [pleading] under the rules." *Id.* Thus, it would be a strange thing indeed for Plaintiff to have *pled facts* that address the no-causal-relation affirmative defense.

It would be even stranger for Plaintiff to produce evidence opposing each and every affirmative defense with his complaint. Indeed, both the Alabama Rules and the Federal Rules would permit the Plaintiff to discover facts and investigate the defendant's affirmative defenses before requiring such evidence to be produced.[81] Such discovery is **necessary** here as Plaintiff cannot possibly produce evidence concerning the "superior knowledge" element of the no-causal-relation defense without engaging in discovery with the Chip Ellis Defendants. Such evidence is solely in the possession control of the Chip Ellis Defendants, which, of course, are Plaintiff's adversaries. Simply put, although DCC has produced affidavit testimony of a Chip Ellis representative which purports to disclaim each of the elements of the no-causal-relation affirmative defense, the mere fact that Plaintiff cannot, at this early stage, produce evidence opposing this affirmative defense does not mean that the Plaintiff has no possibility of recovering against the Chip Ellis Defendants. This case

---

formulation of issues, and pre-trial examination and summary judgment to disclose, in many cases, the true nature of the action, narrow the trial to the real controverted issues, and permit either a plaintiff or a defendant to have judgment, in a relatively short time, where there is no bona fide claim or defense").

[79] Seier v. Peck, 456 So.2d 1079 (Ala. 1984); Gotlieb v. Collat, 567 So.2d 1302 (Ala. 1990).

[80] A.R.C.P. 84.

[81] A.R.C.P. 56(f); F.R.C.P. 56(f).

is concerned with allegations of fraudulent joinder, **not** a motion for summary judgment. In <u>Crowe v. Coleman</u>, 113 F.3d 1536 (11th Cir. 1997), the Eleventh Circuit held that a plaintiff may defeat an allegation of fraudulent joinder **even if** the plaintiff **cannot survive** summary judgment:

> For a Plaintiff to present an arguable claim against an in-state defendant and, therefore, to require a case removed to federal court to be remanded to state court, the plaintiff need not show that he could survive in the district court a motion for summary judgment filed by that in-state defendant. For a remand, the plaintiff's burden is **much lighter** than that: after drawing all reasonable inferences from the record in the plaintiff's favor and then resolving all contested issues of fact in favor of the plaintiff, there need only be "a reasonable basis for predicting that the state law might impose liability on the facts involved." Because the procedures are similar while the substantive standards are very different, district courts must exercise extraordinary care to avoid jumbling up motions for remand and motions for summary judgment that come before them.
>
> In the remand context, the district court's authority to look into the ultimate merit of the plaintiff's claims must be limited to checking for obviously fraudulent or frivolous claims. Although we have said that district courts may look beyond the face of the complaint, we emphasize that the district court is to stop short of adjudicating the merits of cases that do not appear readily to be frivolous or fraudulent.[82]

Other Circuits have gone further and have held that the burden of a defendant to prove fraudulent joinder is more favorable to the plaintiff than the standard for ruling on a motion to dismiss.[83] Here, as shown above, Plaintiff's AEMLD claim withstands the motion to dismiss standard. Furthermore, even assuming that the affidavit produced by DCC proves one or more elements of the Chip Ellis Defendants' affirmative defense, does not mean that they would be entitled to summary judgment. Indeed, this Court itself has recognized that the fact that the plaintiff "may confront significant evidentiary hurdles"[84] does not, by itself, require a finding of fraudulent joinder.

---

[82] <u>Crowe</u>, 113 F.3d at 1541-1542 (citations omitted).

[83] <u>Hartley v. C.S.X. Transportation, Inc.</u>, 187 F.3d 422, 424 (4th Cir. 1999); <u>Batoff v. State Farm Ins. Co.</u>, 977 F.2d 848, 852 (3rd Cir. 1992); *see also* <u>Moore's Federal Practice</u>, §107.14[2][c][iv][B], p.107-62 (3d ed)([t]he standard requiring that the removing party show that the plaintiff cannot establish a claim against the allegedly fraudulently joined party, even after resolving all issues of law and fact in the plaintiff's favor, is even more favorable to the plaintiff than the standard for ruling on a motion to dismiss").

[84] <u>Johnson v. Bridgestone Firestone North Am. Tire LLC</u>, 2006 WL 2480030 (M.D.Ala. Aug. 28, 2006)(Fuller, C.J.).

It is **not** alone. This Court should consider <u>Fitts v. Griffin</u>, 304 F.Supp.2d 1337 (M.D.Ala.2004), where Judge Albritton, following <u>Crowe</u>, rejected a contention that a plaintiff must produce evidence to oppose the removing defendant's evidence that there was no claim against the state-court defendant:

> The Defendants argue that there is no possibility that an Alabama state court would find that the Plaintiffs Complaint states a cause of action against [the Alabama resident defendant] for wantonness because "there is no proof, even in the slightest, of the specific degree of wanton misconduct required by the statute and interpretive case law of this jurisdiction." The Plaintiff contends that the lack of evidentiary support for her allegations results from removal occurring before any discovery has been taken. Also, she asserts that this difficulty is particularly exacerbated in this case, a wrongful death claim, where the only surviving witnesses from the car are Eddie Griffin, Jr., a Defendant, and Eddie Griffin, Sr., the father of a Defendant.

> A plaintiff seeking remand does not need to show that he or she could survive a motion for summary judgment by the non-diverse defendant; the standard is "much lighter." <u>Crowe</u>, 113 F.3d at 1541. In <u>Pritchard</u>, the court addressed a situation in which "in her pleadings, [the plaintiff] alleges simply that, while on duty as a security guard on Hancock's premises on September 6, 2001, Goolsby negligently failed to protect her and negligently failed to intervene to stop the attack." <u>Pritchard v. Hancock Fabrics. Inc.</u>, 198 F.Supp.2d 1288, 1290 (N.D.Ala.2002). Pritchard, the plaintiff, "does not further elucidate her version of the specific facts relating to Goolsby's alleged knowledge or omissions." Nevertheless, the court determined "that her complaint presents an arguable claim against Goolsby for purposes of determining whether his joinder is fraudulent." The court concluded that it was "at least possible that, given an opportunity for full discovery, Pritchard might uncover evidence contradicting Goolsby's version of his role in events and indicating that he knew or should have known that the attack on Hancock's premises was occurring or was an imminent probability and that he failed to take reasonable action to intervene or otherwise protect Pritchard from physical harm." Though noting that "it might appear that Pritchard's claim against Goolsby is quite weak," the court found that it was not fraudulent joinder. The factual situation in this case is similar with the Plaintiff having set forth allegations that could possibly be supported through further discovery, but which currently are unsubstantiated.

> In <u>Rivers</u>, the United States District Court for the Eastern District of Louisiana considered a motion to remand that arose out of a case being brought on behalf of a deceased spouse. <u>Rivers v. Int'l Matex Tank Terminal</u>, 864 F.Supp. 556 (E.D.La.1994). The plaintiff alleged in her complaint that the non-diverse defendants committed intentional acts that caused her husband's illness and eventually his death. While being deposed by defense counsel, the plaintiff conceded that she "knew of nothing that [the non-diverse defendants] did to cause her husband's illness." The

court concluded that "[u]ntil discovery is complete, Mrs. Rivers could not reasonably be expected to know of all events that occurred during the course of her husband's employment. Because her husband has died since the filing of this suit, the only means by which Mrs. Rivers can learn of the underlying facts is through discovery." The plaintiff in Rivers actually confronted fewer difficulties in presenting facts to the court than [the instant plaintiff] because her husband survived for almost a year after the filing of the suit and because presumably there were witnesses, who worked with her husband, that were not defendants or related to defendants.

Viewing this case in light of Pritchard and Rivers, this court finds persuasive the Plaintiffs argument that her claim for wantonness is not the product of fraudulent joinder. The insufficiency of the Plaintiffs allegations to survive a motion for summary judgment does not render her claim insufficient to warrant remanding this claim to state court. Crowe, 113 F.3d at 1541. The court must, "if there is even a possibility that state court would find that the complaint states a cause of action against any . . . resident defendant, . . . find that joinder was proper and remand case to state court." Id. at 1538. There is a possibility that after additional discovery is conducted the Plaintiff will be able to establish that the Defendant engaged in wanton behavior while driving the vehicle that contributed to causing the death of Mr. Fitts.

(some citations omitted).

The Fitts, Pritchard, and Rivers cases are all persuasive here and are directly on-point. DCC's reliance on Johnson v. General Motors Corp., 82 F.Supp.2d 1326 (S.D.Ala.1997) and Brock v. Baxter Healthcare Corp. 96 F.Supp.2d 1352 (S.D.Ala.2000) for the proposition that a products liability plaintiff cannot recover against the end-seller of a product under the AEMLD (Doc.1, p.15) is misplaced for several reasons. Both cases are not binding on this Court, so the Court may disagree with any rationale in these cases as it sees fit. Most respectfully, there is good reason for this Court to disagree with both. Neither followed the directives of the Eleventh Circuit in Crowe that a federal court on a motion to remand is to "stop short of adjudicating the merits of cases that do not appear readily to be frivolous or fraudulent" and "must exercise extraordinary care to avoid jumbling up motions to remand and motions for summary judgment."[85] Nor did either court adequately address the plaintiff's quandary of producing evidence in opposition to the resident defendant's affirmative

---

[85] 113 F.3d at 1541-1542.

defenses without having the ability to undergo discovery. Finally, the fact that the Alabama Supreme Court itself has held that <u>Johnson</u> and <u>Brock</u> were wrongly decided, albeit on other grounds, supports a reasonable view that they were wrongly decided on this ground as well.[86]

DCC has not proven that after discovery, the Plaintiff cannot refute one or more of the elements of any "no-causal-relation" affirmative defense which could be, but has not been, asserted by the Chip Ellis Defendants. Thus, Plaintiffs have stated viable AEMLD claims against the Chip Ellis Defendants and remand is appropriate.

### B.    The Negligence and Wantonness Claims.

The foregoing analysis is sufficient to defeat DCC's fraudulent joinder allegations and require remand back to State Court. However, the fact that Plaintiff's remaining claims pass scrutiny as well gives greater reason for remand. The Alabama Supreme Court has made clear that claims of common law negligence and wantonness can be made and tried alongside AEMLD claims.[87] DCC's contention that Plaintiff's lack of privity with the Chip Ellis Defendants defeats his common law negligence claims is incorrect. It is true that long ago a manufacturer was deemed to not be liable for its negligent design and warnings to persons who were damaged by its products but were not in privity of contract.[88] However, long before the imposition of the AEMLD, Alabama law had **already eviscerated** the privity requirement for product liability claims against manufacturers for claims based on negligent design and negligent warnings.[89] Indeed, in discussing and quoting Judge Cardozo's bellwether case on this issue, the Alabama Supreme Court made this clear:

> If the nature of a thing is such that it is reasonably certain to place life and limb in peril when negligently made, it is then a thing of danger. Its nature gives warning of

---

[86] *See* <u>Vesta Fire</u>, 901 So.2d at n6.

[87] <u>Tillman v. R.J. Reynolds Tobacco Co.</u>, 871 So.2d 28, 34-35 (Ala. 2003).

[88] <u>Sterchi Bros. Stores, Inc. v. Castleberry</u>, 236 Ala. 349, 351, 182 So. 474, 476 (1938).

[89] <u>Defore v. Bourjois, Inc.</u>, 105 So.2d 846, 268 Ala. 228 (1958); <u>Norton Company v. Harrelson</u>, 176 So.2d 18, 278 Ala. 85 (1965); <u>Sears, Roebuck & Company v. Morris</u>, 273 Ala. 218, 136 So.2d 883 (1961).

> the consequences to be expected. If to the element of danger there is added knowledge that the thing will be used by persons other than the purchaser and used without new tests, then, **irrespective of contract**, the manufacturer of this thing of danger is under a duty to make it carefully.[90]

Furthermore, when our Supreme Court fashioned the AEMLD claim from the best parts of a negligence law and warranty law in 1976, it preserved the "no privity" rule for **all three** of the types of products claims that may be brought against a manufacturer in a personal injury case, not just the AEMLD claim:

> We do not believe that adopting [the AEMLD] conflicts with the public policy of this State. Changes to the proposed [UCC] by the Alabama Legislature **enlarged the concept of privity**, in extending the seller's warranty to any natural person who might be expected to use, consume, or be affected by the goods. [Defendant] argues that these changes were not meant to imply the adoption of strict tort liability. We agree; but it is an **indication** of the legislature's recognition that the **old privity shield** against liability was **no longer to be tolerated** in this State.[91]

To support this conclusion, the Court reasoned that in making changes to UCC,[92] our legislature "**departed** from the **strict rule of privity in products liability cases** and otherwise **augmented** the rights of **injured** consumers."[93] Thus, privity is no longer a bar in product liability claims brought under general negligence or wantonness principles. None of DCC's cited cases are personal injury or death cases; nor do they concern a defective product; thus, they do not consider the concept of privity in the appropriate context.

---

[90] McFadden v. Ten-T Corp., 529 So.2d 192, 193 (Ala. 1988)(*quoting* MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050, 1053 (1916)).

[91] Atkins, 335 So.2d at 141-142.

[92] *See e.g.* Ala. Code § 7-2-316 (amended to add subsection 5 prohibiting the seller from limiting or excluding his liability for damages for injuries to the person in the case of consumer goods); § 7-2-318 (amended to extend the ambit of the seller's warranty to any natural person who might reasonably be expected to use, consume or be affected by the goods); § 7-2-714(2)(amended so as to make it clear that the damages allowable in actions for injury to the person are the same as those damages ordinarily allowable in such actions at law); § 7-2-715(2)(b)(added to allow the recovery of consequential damages in cases involving injuries to personal property resulting from a breach of warranty); § 7-2-719(4)(added to prevent the seller from contractually modifying or limiting the buyer's remedy in cases for damages for injury to the person in the case of consumer goods); § 7-2-725(2)(amended to provide that a cause of action for injury to the person in the case of consumer goods arises when the injury occurs as opposed to when the sale takes place, thus extending the statute of limitations).

[93] Atkins, 335 So.2d at 141-142.

## C.    The Implied Warranty of Merchantability Claims.

Plaintiff's implied warranty of merchantability claims made pursuant to Ala. Code § 7-2-314 also pass the fraudulent joinder test. Under this statute, a seller impliedly warrants that "that the goods shall be merchantable in a contract for their sale if the seller is a merchant with respect to goods of that kind."[94] The Alabama Supreme Court has made clear that claims for the breach of Alabama's implied warranty of merchantability can be made and tried alongside AEMLD claims.[95] All of DCC's contentions that Plaintiff has no possibility of recovering against the Chip Ellis Defendants on his implied warranty of merchantability claim are incorrect.

First, DCC's contention that Plaintiff was required to be in contractual privity with the Chip Ellis Defendants to recover for the breach of the implied warranty of merchantability (Doc.1, p.13) is incorrect. While it is true that privity is required in cases that only involve property damage,[96] the Alabama legislature in enacting § 7-2-318 explicitly provided that there be **no privity requirement** for breach of warranty claims when the plaintiff is seeking to recover for **personal injuries**:

> A seller's warranty, whether express or implied, extends to any natural person if it is reasonable to expect that such a person may use, consume or be affected by the goods, and who is injured in person by the breach of the warranty. A seller may not exclude or limit the operation of this section.

---

[94] Ala. Code § 7-2-314(1) and (2).

[95] *See* Spain v. Brown & Williamson Tobacco Corp., 872 So.2d 101, 111 (Ala. 2003)(discussing at some length the distinction between a breach-of-warranty claim under Alabama's UCC and a claim under the AEMLD, and stating that "a claim alleging breach of an implied warranty of merchantability is separate and distinct from an AEMLD claim and is viable to redress an injury caused by an unreasonably dangerous product"); *see also* Vesta Fire, 901 So.2d at 103 ("[w]e therefore conclude that the plaintiffs' negligence claims and breach-of-warranty claims were not subsumed by their AEMLD claims and that this rationale is not a proper basis for supporting a summary judgment for [defendant] as to those claims").

[96] *See* Wellcraft Marine v. Zarzour, 577 So.2d 414 (Ala. 1990)(plaintiff only sought economic loss as a result of damage to a boat); Bryant v. Southern Energy Homes, Inc., 682 So.2d 3 (Ala. 1996)(plaintiff only sought economic loss as a result of water leaks and other problems with a manufactured home); Rhodes v. General Motors Corp., 621 So.2d 945 (Ala. 1993)(plaintiff only sought economic loss as a result of mechanical problems with an automobile); *see also* Hobbs v. General Motors Corp., 134 F.Supp. 1277 (M.D. Ala.2001)(plaintiff only sought economic loss as a result of misrepresentations of size of spare tire); Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (1997)(fraud claim for property damage); Grand Manor, *supra* (specifically holding that plaintiff's mental anguish claims do not rise to level of personal injury); Horton Homes, Inc. v. Brooks, 832 So.2d 44 (Ala. 2001)(property damage claims).

The Alabama Supreme Court has held that this section means exactly what it says -- that there is no privity requirement for breach of warranty claims against a manufacturer for personal injuries.[97]

Second, DCC's contention that the Chip Ellis Defendants' alleged exclusion of warranties when it sold the vehicle to Lorene Bentley and Christopher Traylor bars Plaintiff's implied warranty of merchantability claim (Doc.1,p.13) is incorrect. Sellers like the Chip Ellis Defendants do not have to "give" the implied warranty of merchantability before a plaintiff can sue upon it; to the contrary, it is **implied by law** into every transaction of goods, and the Alabama Legislature has declared in Ala. Code § 7-2-316(5) that it **cannot** be limited or excluded in personal injury cases.[98]

Third, DCC's contention that Plaintiff's alleged failure to provide notice of the defects in the Subject Vehicle allegedly thwarts his implied warranty of merchantability claim (Doc.1, p.13) is incorrect. The Alabama Supreme Court has determined that notice need not be given when the warranty beneficiary suffers a personal injury.[99] Since this case solely concerns personal injuries, no notice is required to be proven or pleaded. DCC's reliance on Parker v. Bell Ford, Inc., 475 So.2d 1101 (Ala. 1983) for a contrary rule is misplaced. The Parker case was a case for property damage only.

Finally, DCC's contention that the implied warranty of merchantability does not arise in a sale of used vehicles (Doc.1,p.13) is contrary to the Official Commentary to Ala. Code § 7-2-314, the implied warranty of merchantability statute, which states that "[a] contract for the sale of second-

---

[97] *See* 577 So.2d at 419 (*quoting* State Farm Fire & Cas. Co. v. J.B. Plastics, Inc., 505 So.2d 1223, 1227 (Ala. 1987)("[w]hile Alabama's version of U.C.C. 2-318 has abolished privity requirements in actions involving injuries to natural persons, the privity requirements still remain[] in cases of strictly economic injury"); *see also* Bishop v. Faroy Sales, 336 So.2d 1340 (Ala. 1976)(holding that § 7-2-318 "eliminates the vertical privity requirement" in implied warranty suits against manufacturers if it is reasonable to expect that such person may use, consume or be affected by the goods and is injured in person by breach of the warranty); Kidd v. Kilpatrick Chevrolet, Inc., 613 So.2d 336, 338 (Ala. 1993)("Alabama has abolished privity requirements in actions involving personal injuries, but actions where the claim alleges purely economic injury, such as this case, privity is still required.").

[98] *See also* Gaylord v. Lawler Mobile Homes, Inc., 477 So.2d 382 (Ala. 1985).

[99] Simmons v. Clemco Industries, 368 So.2d 509 (Ala. 1979).

hand goods involves only such obligation as is appropriate to such goods for that is their contract description."[100] While there are some non-personal-injury cases between *sophisticated* entities that hold that there is no implied warranty of merchantability in a sale of a used vehicle in very unique circumstances, there is no Alabama appellate court case that has decided whether there is an implied warranty of merchantability in the sale of a used motor vehicle in a consumer personal injury context such as is presented in the instant case. Both of DCC's cited cases[101] cite to the "general rule" from Trax, Inc. v. Tidmore, 331 So.2d 275, 277 (Ala.1976), a case where the buyer and seller were not only trading at arms length in a business context, but the buyer-plaintiff had **previously owned** the tractor at issue, sold it to the defendant-seller, and then **repurchased it** back. The Trax Court noted the above-cited Official Commentary to § 7-2-314 that creates an implied warranty of merchantability in the sale of second-hand goods "as is appropriate to such goods for that is their contract description," but held that in the **"unique" facts** of the Trax case that there was no warranty. In so holding, however, the Trax Court was careful to note the unique situation before it and warned against any future over-extension of its holding such as DCC attempts in this case:

> We make **no attempt** to set out any broad principles to govern implied warranties in the ordinary sales of used motor vehicles in the future. We hold only that there was no implied warranty connected with the transaction in this particular case. The facts here **are unique.** [The buyer-plaintiff] had owned the tractor; used it, and knew much more of its quality and condition than did [the seller-defendant]. [The buyer-plaintiff] persuaded [the seller-defendant] to purchase it by paying off the mortgage on it and two others [the buyer-plaintiff] had owned and used. [The buyer-plaintiff] either rented or purchased the tractor from [the seller-defendant] after [the seller-defendant] had repaired it.[102]

It should be noted that DCC **did not** cite to Trax in its removal notice. Its first cited case, Osborn v. Custom Truck Sales & Service, *supra*, dealt with a situation like Trax, a case where a an owner of

---

[100] Ala. Code § 7-2-314, Official Comment 3.

[101] *E.g.* Osborn v. Custom Truck Sales & Service, 562 So.2d 243 (Ala. 1990); Roland v. Cooper, 768 So.2d 400, 406 (Ala.Civ.App.2000).

[102] Trax, 331 So.2d at 277-278; (emphasis added).

a concrete business bought cement trucks in an arms length negotiation and there was no personal injury involved. However, the <u>Osborn</u> Court did not discuss the "unique facts" in <u>Trax</u> or that the <u>Trax</u> holding was limited to those facts; instead, it only quoted briefly the "general rule" from <u>Trax</u>. DCC's second-cited case, <u>Roland v. Cooper</u>, 768 So.2d 400 (Ala.Civ.App. 2000), was another economic damages case solely between sophisticated business entities where no personal injury was involved. Similar to the <u>Osborn</u> Court, the <u>Roland</u> Court also bluntly stated, without analysis, that "warranties of merchantability . . . are not implied in the sale of used vehicles." In neither of DCC's cited cases did the plaintiff attempt to distinguish the "unique facts" in <u>Trax</u>, nor did they attempt to point-out that the Official Commentary is contra to a blanket "no warranty" rule.

Therefore, the Alabama Supreme Court did not foreclose the implied warranty of merchantability cause of action in all used vehicle cases as DCC contends.[103] Judge Myron Thompson of this Court noted this fact in <u>Montgomery Rubber and Gasket Company, Inc. v. Belmont Machinery Company, Inc.</u>, 308 F.Supp.2d 1293, 1301-1302 (M.D.Ala.2004), another case between sophisticated business entities:

> Comment 3 [to § 7-2-314] explains that used goods, such as the boring mill in question, are **still covered** by an implied warranty: "A specific designation of goods by the buyer does not exclude the seller's obligation that they be fit for the general purposes appropriate to such goods. A contract for the sale of second-hand goods, however, involves only such obligation as is appropriate to such goods for that is their contract description." 1975 Ala.Code § 7-2-314 (emphasis added). Although some case law states that there is simply no warranty for a used vehicles, *see, e.g.*, <u>Osborn v. Custom Truck Sales & Service</u>, 562 So.2d 243 (Ala.1990), the commentary above suggests that there **should not be a blanket rule** regarding used machines. As explained by a Florida court, "The standard that must be met for used goods to meet the requirement of merchantability is necessarily different from that required as to new goods. . . . [A]mong the factors to be considered in determining the merchantability of used goods are (1) the extent of prior use, (2) the buyer's knowledge of the used goods, and (3) whether the price for the goods was

---

[103] To the contrary, the Alabama Supreme Court seemed open to such an argument as late as 2005 in <u>Bagley v. Creekside Motors</u>, 913 So.2d 441 (Ala. 2005), where the Court affirmed the "general rule" from <u>Trax</u>, <u>Osborne</u>, and <u>Roland</u>, but noted that the plaintiff in that case failed to attempt to distinguish those cases.

significantly discounted at the time of sale." <u>McCormick Machinery, Inc. v. Julian E. Johnson & Sons, Inc.</u>, 523 So.2d 651 (Fla 1st DCA 1988); *see also* <u>International Petroleum Services, Inc. v. S & N Well Service, Inc.</u>, 230 Kan. 452, 639 P.2d 29 (1982).

If the Alabama Supreme Court rules as Judge Thompson suggests it would, it would certainly not be alone. As noted by a modern commentator who did a nationwide assessment of the matter:

> The Uniform Commercial Code provides that . . . certain implied warranties, including the warranties of merchantability, . . . accompany a contract for the sale of goods, regardless of the intention of the parties. The majority of jurisdictions have held that these implied warranties apply to the sale of used motor vehicles, and that sellers who breach an implied warranty by selling a second-hand vehicle that is defective, unfit, or lacks clear and unencumbered title, are liable for damages as provided for under the Code. . . .
>
> > . . .
>
> Article Two of the Uniform Commercial Code, dealing with transactions in goods, has considerably modified the common-law doctrine of "caveat emptor" by providing that certain implied warranties, including the warranties of merchantability, . . . accompany a sales contract, regardless of the intentions of the parties. Because the Code makes no distinction between new and used goods, the vast majority of courts have held that its implied-warranty provisions apply to the sale of used or second-hand motor vehicles . . . .[104]

When state law is uncertain on a legal issue that pertains to whether a resident defendant is fraudulently joined, the Eleventh Circuit has required district courts to remand the case so State courts can decide the novel issue of law. Consider again the Eleventh Circuit's opinion in <u>Crowe</u> where it refused to make an "<u>Erie</u>-guess" on a controlling issue of Georgia law. At issue was whether the plaintiff could maintain an arguable claim of nuisance against a Georgia defendant under Georgia law. There was no established Georgia Supreme Court decision on the issue and the decisions of the

---

[104] Schmauder, <u>Liability on Implied Warranties in Sale of Used Motor Vehicle</u>, 47 A.L.R.5th 677, §§1,2[a] (1997 and Supp.)(citations omitted)(*citing* <u>Black v. Don Schmid Motor, Inc.</u>, 232 Kan 458, 657 P.2d 517 (1983); <u>Faulkingham v Seacoast Subaru, Inc.</u>, 577 A.2d 772 (Me. 1990); <u>Hensley v. Colonial Dodge, Inc.</u>, 69 Mich.App. 597 (1976); <u>Worthey v. Specialty Foam Products, Inc.</u>, 591 S.W.2d 145 (Mo.App.1979); <u>McCormack v. Lynn Imports, Inc.</u>, 114 Misc.2d 905, 452 N.Y.S.2d 821 (1982); <u>Rose v. Epley Motor Sales</u>, 288 N.C. 53, 215 S.E.2d 573 (1975); <u>Subaru, in Wright v. T.&B. Auto Sales, Inc.</u>, 72 N.C. App. 449, 325 S.E.2d 493 (1985); <u>Ismael v. Goodman Toyota</u>, 106 N.C. App. 421, 417 S.E.2d 290 (1992); <u>Patton v. McHone</u>, 822 S.W.2d 608 (Tenn.App.1991); <u>Testo v. Russ Dunmire Oldsmobile, Inc.</u>, 16 Wash.App. 39, 554 P.2d 349 (1976); <u>State Farm Mut. Auto. Ins. Co. v. Ford Motor Co.</u>, 736 So.2d 384 (Miss. Ct. App. 1999)).

various Georgia Courts of Appeal showed inconsistent results. The defendant argued that under

Georgia law there was no cause of action against the resident defendant and, therefore, there was

fraudulent joinder. However, the Eleventh Circuit distinguished a federal court's responsibility for

ascertaining state law in cases where its jurisdiction is **undisputed** and its responsibility where a

diverse defendant has removed the case to federal court on the basis of **fraudulent joinder**:

> . . . Georgia case law may be in conflict on this issue. But, at this point in the
> procedural history of the case -- that is, on a motion for remand, our analysis (as well
> as the district court's) must be **limited** to determining whether Plaintiffs have even
> an **arguable** claim. So, **any** ambiguity or doubt about the substantive state law
> **favors remand** to state court.
>
> . . .
>
> On the face of the [conflicting] opinions, there appears to be a conflict on this
> issue in the Georgia appellate decisions. . . . If this case were properly before the
> district court (and this court) under original diversity jurisdiction, we would be
> obligated to predict how the Georgia Supreme Court would rule on this issue or to
> certify the question to the Georgia Supreme Court. For purposes of determining
> whether this case should be remanded to state court, however, the inquiry by federal
> judges **must not** go so far:
>
>> This is an Erie problem in part, but **only part**. In the usual diversity situation
>> a Federal Court, no matter how difficult the task, must ascertain (and then
>> apply) what the state law is. . . . But here the question is whether there is
>> arguably a reasonable basis for predicting that the state law might impose
>> liability on the facts involved. If that possibility exists, a **good faith** assertion
>> of such an expectancy in a state court is **not** a sham . . . and is **not** fraudulent
>> in fact or in law.
>
> Bobby Jones Garden Apartments v. Suleski, 391 F.2d 172, 176-77 (5th Cir.
> 1968)(citations omitted). In this case, the arguable confusion in Georgia law itself
> supports remanding this case to state court. See Parks, 308 F.2d at 477 (noting in
> fraudulent joinder case that, "doubtful issues of law due to absence of definite
> pronouncements by the state supreme court are to be tried in the court having original
> jurisdiction of the case and are not to be determined in a removal proceeding.").[105]

This analysis is equally applicable here where there is no clear answer under Alabama law.

In fraudulent joinder inquiry, federal courts are not to weigh the merits of a plaintiff's claim beyond

---

[105] 113 F.3d at 1540.

determining whether the claim is arguable under state law.[106] Nor should this Court be concerned whether the Plaintiff ultimately prevails on this theory. _Id._ Paraphrasing the words of the Eleventh Circuit:

> If removal is doubtful, we remand the case. Therefore, we send this case back to the district court to remand it to state court. In doing so, we express no view of the ultimate outcome on the merits. [Alabama's] state courts -- which have the final word on [Alabama] law -- will decide all that.[107]

As such, the State Court should be allowed to resolve this legal issue on remand.

### D.    DCC's Arbitration Arguments Are Without Merit.

Finally, DCC's contention that the Chip Ellis Defendants are not proper defendants in this action because the purchaser of the subject vehicle, **who is someone other than the Plaintiff**, signed an arbitration agreement at the time of its purchase from the Chip Ellis Defendants (Doc.1,p.15) is without merit. The Plaintiff **was not a party** to any alleged arbitration agreement, and, even if he was, diversity jurisdiction would still not exist because a properly named resident defendant is not "fraudulently joined" simply because there is an arbitration agreement between the parties.

### 1.    Plaintiff Is Not Bound to Arbitrate His Claims Because He Is a Nonsignatory to the Arbitration Agreement.

DCC has not met its **very heavy burden** required for a finding of fraudulent joinder by showing that the Plaintiff must arbitrate his claims against the Chip Ellis Defendants. Because the duty to arbitrate is a contractual duty, "parties cannot be required to arbitrate unless they have agreed to arbitrate."[108] Thus, in determining whether to compel a party to arbitrate, this Court should determine as an initial matter whether the parties agreed to arbitrate. It is undisputed that Plaintiff not a signatory to the agreement proffered by DCC. A nonsignatory to an arbitration agreement

---

[106] <u>Pacheco</u>, 139 F.3d at 1380-1381.
[107] <u>Crowe</u>, 113 F.3d at 1543.
[108] <u>Southern Energy Homes, Inc. v. Ard</u>, 772 So.2d 1131, 1134 (Ala. 2000).

cannot be forced to arbitrate its claims unless the nonsignatory falls under one of the very limited exceptions to the general rule.[109] None of these exceptions apply in this case.

First, although arbitration agreements bind non-signatories when the signatories agree to extend the arbitration provisions to the nonsignatory, where the arbitration agreement is specifically limited to claims between the parties to the contract, the nonsignatory is not bound by the arbitration agreement.[110] In this case, the agreement by its terms only applies to disputes between the Chip Ellis Defendants and the purchasers of the Subject Vehicle, Lorene Bentley and Christopher Traylor. Therefore, Plaintiff is not bound.[111]

Second, this is not a case where the Plaintiff must be forced to arbitrate his personal injury claims under the limited theory of "arbitration by equitable estoppel." This theory is only available when claims against a nonsignatory to a contract containing an arbitration provision are "intertwined with" the facts surrounding the underlying contract -- *i.e.* where the plaintiff asserts breach of duty imposed or entailed by that contract or the plaintiff alleges conspiracy or agency between a nonsignatory and a signatory to a contract containing an arbitration clause.[112] Neither of these exceptions are present in this case.

The first narrow "intertwining" exception is that a party cannot accept the benefit of a cause of action which arises *solely* because of a contract while avoiding the burdens or limitations imposed

---

[109] <u>Cook's Pest Control, Inc. v. Boykin</u>, 807 So.2d 524, 526 (Ala. 2001)("[i]t is the general rule that a nonsignatory to an arbitration agreement cannot be forced to arbitrate her claims")(*citing Ex parte* <u>Stripling</u>, 694 So.2d 1281 (Ala. 1997), *and* <u>Thomson-CSF, S.A. v. American Arbitration Ass'n</u>, 64 F.3d 773 (2d Cir.1995))); *see also* <u>Ard</u>, 111 So.2d at 1134 ("we recognize that parties cannot be required to arbitrate unless they have agreed to arbitrate").

[110] *Ex parte* <u>Lovejoy</u>, 790 So.2d 933 (Ala. 2000); <u>Parkway Dodge, Inc. v. Yarbrough</u>, 779 So.2d 1205 (Ala. 2000); *Ex parte* <u>Stamey</u>, 776 So.2d 85, 89-90 (Ala. 2000); <u>First Family Fin. Servs., Inc. v. Rogers</u>, 736 So.2d 553 (Ala. 1999); <u>Med Center Cars, Inc. v. Smith</u>, 727 So.2d 9 (Ala. 1998); *Ex parte* <u>Isbell</u>, 708 So.2d 571 (Ala. 1997); *Ex parte* <u>Martin</u>, 703 So.2d 883 (Ala. 1997); *Ex parte* <u>Jones</u>, 686 So.2d 1166 (Ala. 1996); *Ex parte* <u>Stallings & Sons, Inc.</u>, 670 So.2d 861 (Ala. 1995).

[111] *See e.g.* <u>Monsanto Co. v. Benton Farm</u>, 813 So.2d 867 (Ala. 2001); <u>Norman v. Occupational Safety Ass'n of Alabama Workmen's Compensation Fund</u>, 776 So.2d 788 (Ala. 2000); <u>Southern Energy Homes, Inc. v. Kennedy</u>, 774 So.2d 540 (Ala. 2000); <u>Homes of Legend, Inc. v. Fields</u>, 751 So.2d 1228 (Ala. 1999).

[112] <u>Lovejoy</u>, *supra* (*citing* <u>Isbell</u>, *supra*); <u>Napier</u>, *supra*; <u>Med Center</u>, *supra* (intertwining through conspiracy allegations); <u>Isbell</u>, *supra* (*citing* *Ex parte* <u>Gray</u>, 686 So.2d 250, 251 (Ala. 1996)(intertwining through agency allegations)).

by the an arbitration provision contained in that contract.[113] None of the claims made the basis of this suit qualify under this exception because they do not arise out of the sales agreement. The tort-based product liability claims at issue here are based on principles of negligence, wantonness, and the AEMLD. These theories are **not dependent** on the sales contract for their validity. As stated above, as early as 1958, the Alabama Supreme Court ruled that negligence/wantonness-based products liability actions sounding in tort were not dependent upon a contractual relationship, but instead were based on an entity improperly placing a product on the market which was inherently or imminently dangerous.[114] In 1976, the Court preserved this approach in when it created AEMLD liability, which the Court held "attaches solely because the defendants have exposed expected users of a product to reasonably safe to unreasonable risks."[115] Indeed, the Court specified that a plaintiff can prove a *prima facie* case under the AEMLD even though "the user or consumer had not bought the product from, or entered into any contractual relation with, the seller."[116] Nor do Plaintiff's implied warranty of merchantability arise from the sales contract. Those claims arise by operation of law pursuant to Alabama's UCC. It should be noted that Plaintiff's complaint does not assert a claim for breach of express warranty against the Chip Ellis Defendants.

The only other way there can be "intertwining" is if the plaintiff alleges a conspiracy or agency relationship between the signatory defendant and the nonsignatory defendant. No such allegations are implicated in this case.

The Alabama Supreme Court has held that "[a]rbitration is strictly a matter of contract; if the parties have not agreed to arbitrate, the courts have no authority to mandate that they do so."[117]

---

[113] Georgia Power Co. v. Partin, 727 So.2d 2, 5 (Ala. 1998); *Ex parte* Dyess, 709 So.2d 447, 450 (Ala. 1997); Isbell, *supra*.

[114] *See* Defore, *supra*.

[115] Casrell, 335 So.2d at 132; Atkins, 335 So.2d at 138.

[116] Casrell, 335 So.2d at 132-133; Atkins, 335 So.2d at 141.

[117] *Ex parte* Tony's Towing, Inc., 825 So.2d 96, 99 (Ala. 2002).

Simply put, "[a]t no point did [Plaintiff] indicate a willingness to arbitrate with [the Chip Ellis Defendants]." *Id.* Therefore, the claims made the basis of this suit are not subject to mandatory arbitration.

>2.    **A Plaintiff that Is Bound to Arbitrate with a State Court Defendant Is Not Fraudulently Joined.**

Moreover, **even if** an enforceable, binding arbitration agreement between the Plaintiff and the Chip Ellis Defendants existed (which it does not), as set-forth in detail by Judge Brevard Hand of the Southern District in <u>Frank v. American General Finance</u>, 23 F.Supp.2d 1346 (S.D.Ala.1998), a resident defendant is not fraudulently joined in an action against a diverse defendant just because the claims against the resident defendant might be subject to binding arbitration. In <u>Frank</u>, American Bankers Insurance Company of Florida ("American Bankers") argued that two Alabama residents were fraudulently joined because the plaintiff had an arbitration agreement with them. Like DCC here, American Bankers argued that fraudulent joinder should extend to situations where a valid cause of action exists against the resident defendant, but plaintiff is precluded by the arbitration clause from pursuing the action in a judicial forum. Judge Hand called this argument "untenable" for five reasons.

<u>**First**</u>, Judge Hand held that the mere existence of an arbitration agreement does not divest a court -- state or federal -- of jurisdiction. He noted that the U.S. Supreme Court "has never held that the FAA abrogates a state court's jurisdiction over an action which is governed by an arbitration agreement." To the contrary, he found that "the FAA's 'substantive' provisions -- §§ 1 and 2 -- are applicable in state as well as federal court" and that "[t]he FAA contains no express pre-emptive provision, nor does it reflect a congressional intent to occupy the entire field of arbitration"[118]

<u>**Second**</u>, Judge Hand held that the existence of an arbitration agreement between a plaintiff

---

[118] *Quoting* <u>Volt Info. Sciences, Inc. v. Bd. of Trustees of the Leland Stanford Jun. Univ.</u>, 489 U.S. 468, 477, n6 (1989).

and a defendant does not necessarily mean that all of the plaintiff's claims against that defendant are arbitrable under the agreement.[119]

**Third**, Judge Hand held that "courts, not arbitrators, ordinarily will decide whether or not a particular dispute is arbitrable."[120] Judge Hand reasoned that "[i]f the Court has the responsibility to determine the issue of arbitrability of a plaintiff's claims against a defendant, that defendant cannot be said to have been fraudulently joined." This holding in Frank is especially important in this case because the instant Plaintiff, in Argument II-D-2, *infra*, shows that there is a reasonable legal and factual basis that his claims are **not** arbitrable.

**Fourth**, Judge Hand reasoned that "even if it were established that the arbitration agreement at issue is otherwise valid and enforceable and that the parties have clearly and unmistakably agreed to submit the arbitrability question itself to arbitration, the right to arbitrate is a waivable right which the defendant may waive intentionally or even negligently by failing to assert it timely or some other 'default in proceeding with such arbitration.'"[121] Here, at the time of the filing of this motion, Chrysler-Jeep had not filed a motion to compel arbitration.

**Fifth** and **most important**, Judge Hand acknowledged that "even an order compelling arbitration does not under the FAA divest the court, state or federal, of jurisdiction." Citing to section 3 of the FAA,[122] Judge Hand noted that:

---

[119] *Citing* Volt, 489 U.S. at 478; *and* Dean Witter Reynolds v. Byrd, 470 U.S. 213, 219 (1985).

[120] *Citing* Scott v. Prudential Securities, Inc., 141 F.3d 1007, 1011 (11th Cir. 1998); AT&T Tech., Inc. v. Communications Workers, 475 U.S. 643, (1986); *and* First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995)("[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so.").

[121] *Quoting* 9 U.S.C. § 3; *and citing* Morewitz v. West of England Ship Owners Mutual Protection and Indemnity Ass'n., 62 F.3d 1356, 1365 (11th Cir. 1995); *and* Dean Witter Reynolds, Inc. v. Fleury, 138 F.3d 1339, 1342 (11th Cir. 1998).

[122] That section states that "[i]f any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties **stay** the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration." 9 U.S.C. § 3.

> Assuming American Bankers is correct when it asserts that a valid arbitration agreement exists between plaintiff and [the Alabama defendants] and that the parties have agreed to submit the issue of arbitrability to the arbitrator, the court having jurisdiction over the litigation is **only expressly authorized to stay** the action pending such arbitration. This Court is certainly not prepared to ignore the clearly expressed Congressional directive in 9 U.S.C. § 3 that an action subject to a valid and enforceable arbitration agreement must **only be stayed** rather than dismissed.[123] Consequently, again it must be said that the existence of the arbitration agreement does not divest the court, either state or federal, of subject matter jurisdiction and that the joinder of a resident defendant is therefore not fraudulent merely because only arbitrable claims have been asserted against that defendant.

Although <u>Frank</u> is not binding on this Court, Judge Hand's opinion is so well-reasoned on this issue that it will certainly be followed by the Eleventh Circuit. It has already been followed by another federal court in <u>Briarpatch Ltd., L.P. v. Pate</u>, 81 F.Supp.2d 509 (S.D.N.Y.2000). Because resident defendants are not fraudulently joined merely because a plaintiff has a binding arbitration agreement with them, the Chip Ellis Defendants are not fraudulently joined.

**None** of DCC's many frivolous grounds for its claim of fraudulent joinder have any merit, and in fact, this case has been "fraudulently removed." Because DCC has failed to establish that Plaintiff has "no possibility of recovering" against the Chip Ellis Defendants, this case should be remanded back to State Court.

## <u>Conclusion</u>

While DCC accuses the undersigned of violating "ethical considerations applied to counsel's representations about jurisdictional matters" (Doc.1. p.14), the foregoing shows that it is DCC, and not the Plaintiff, that has not followed clear principles of law and has wrongfully removed this case to this Court. At present, Plaintiff does not seek attorneys fees nor costs pursuant to 28 U.S.C. §

---

[123] *See also* <u>Bender v. A.G. Edwards & Sons, Inc.</u>, 971 F.2d 698 (11th Cir. 1992)("The district court properly found that the state law claims were subject to arbitration, but erred in dismissing the claims rather than staying them. Upon finding that a claim is subject to an arbitration agreement, the court should order that the action be stayed pending arbitration. 9 U.S.C. § 3. If the parties do not proceed to arbitration, the court may compel arbitration. 9 U.S.C. § 4"); *and* <u>Lewis v. Oakley</u>, 847 So.2d 307 (Ala. 2002)(trial court may only compel a case to arbitration if an arbitration agreement exists; it may not dismiss it).

1447(c), but he reserves the right to do so if additional meritless arguments are asserted by DCC.

**WHEREFORE, PREMISES CONSIDERED**, the Plaintiff respectfully requests this

Honorable Court to remand this action back to the State Court.

*** Oral Argument Not Requested***

Respectfully submitted,

 /s/ Thomas P. Willingham
Thomas P. Willingham (WIL156)
Attorney for Plaintiff Donte Toney

*OF COUNSEL:*
ALVIS & WILLINGHAM, L.L.P.
1400 Urban Center Drive; Suite 475
Birmingham, Alabama 35242
Phone: (205)298-1011
Fax: (205)298-1012
twillingham@alvisandwillingham.com

*ALSO REPRESENTING PLAINTIFF*:
Walter E. McGowan, Esq. (MC016)
GRAY, LANGFORD, SAPP,
MCGOWAN, GRAY & NATHANSON
Post Office Box 830239
Tuskegee, Alabama 36083
Phone: (334)727-4830
Fax: (334)727-5877
wem@glamgn.com

**Certificate of Service**

I hereby certify that on this the ___ day of February, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to: Joel Chandler Bailey, II, Esq. (cbailey@lfwlaw.com); Michael Lester Bell, Esq. (mbell@lfwlaw.com); and Natasha Lynke Wilson, Esq. (nwilson@lfwlaw.com)

 /s/ Thomas P. Willingham
*OF COUNSEL*